Michael VOGT and Beverly Vogt, husband and wife, Plaintiffs–Respondents,

v.

Christopher E. HAYES and Pamela R. Hayes, d/b/a Chris Hayes Log Home Construction, Defendants–Appellants,

and

Michael Moppin, Defendant.

No. 23865.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 28, 2001.

Daniel C. Mizell, Inglish & Monaco, P.C., Lake Ozark, for appellants.

Michael A. Carter, David T. Welch, Phillips, McElyea, Walker & Carpenter, P.C., Camdenton, for respondents.

NANCY STEFFEN RAHMEYER,
Judge.

Michael and Beverly Vogt hired Christopher E. Hayes to build a log home on a lot they owned at the Lake of the Ozarks. Hayes stopped work on the home before it was finished. The Vogts sued Hayes and his wife, Pamela, under theories of breach of contract, misrepresentation, breach of warranty of inhabitability, and conversion.[1] The trial court entered judgment in favor of the Vogts on their claim of breach of

---

1. The Vogts also sued Michael Moppin, an individual who built a concrete retaining wall for the Vogts' house. A default judgment was entered against Mr. Moppin. Mr. Moppin is not a part of this appeal.

contract and awarded the Vogts $32,000. The trial court also entered judgment in favor of the Vogts on the misrepresentation claim and entered a judgment of $6,000 in actual damages, and $20,000 in punitive damages. The trial court found for Hayes[2] on the remaining counts. Hayes appeals the judgment entered against him.

In 1995 the Vogts contacted Hayes regarding having a log home built on property they owned at Lake of the Ozarks. They gave plans for a log home to Hayes. Hayes then sent those plans to Colonial Structure, Inc., a company that designed and manufactured materials for log homes. Colonial Structure later sent back to Hayes detailed blueprints for the home the Vogts wanted to construct. On the blueprints was the following language: "Colonial Structure Incorporated is supplier of materials on this plan, prepared for the convenience of the purchaser of materials supplied by Colonial Structures." The Vogts understood that these plans were for a complete home that would be ready for them to move into upon completion. Hayes told the Vogts that he would build that home and it would be completed and ready for them to move into when he was done.

Hayes presented the Vogts with a log home plan package for a completed home pursuant to the plans from Colonial Structure at a cost of $89,277. Hayes called the package an "estimate." Attached to that plan was a cost sheet listing all of the costs involved in completing the home. Hayes proposed that the Vogts pay a $10,065 deposit for logs, and $23,487 for delivery of the log package. The Vogts were to pay six draws of $9,000 each, with a final payment of $1,725.

The Vogts paid Hayes to start the project. Construction began in April 1996 and continued until November 1996. A dispute arose when Hayes called the Vogts and wanted additional money to put glass in the front of the house. Hayes told them that the original proposal did not include any glass for the front of the house although the Vogts believed it was included in the original proposal.

On February 1, 1997, the Vogts and Hayes had a meeting with the Vogts' banker. At that meeting Hayes said it would take an additional $23,380 to finish the project. At that time the Vogts had disbursed approximately $85,000 out of their $90,000 loan. The Vogts agreed to pay Hayes an additional $11,228 to finish the house. The parties agreed that no more money would be disbursed until the house was finished.

Hayes contacted the Vogts several times after that meeting to ask for more money to complete the job, but they refused pursuant to the agreement reached at the February meeting. Hayes threatened to walk off the job if he did not receive more money. In April 1997, Hayes quit working on the home altogether.

When Hayes left without finishing the house, numerous items had not been completed. The Vogts hired a structural engineer and then discovered that the log package delivered to the home was not from Colonial Structures. Instead, Hayes had bought and cut his own logs, some of which had dry rot and holes. The engineer told them that it was dangerous to live in the house in the condition in which

---

**2.** We will discuss this case as if Christopher Hayes was the sole defendant-appellant only for the ease of the reader. The evidence indicated that Pamela Hayes' involvement in the facts of this case was minimal; however, we do not intend to imply that the judgment or our opinion applies any less to Pamela Hayes than it does to Christopher Hayes. No disrespect to Pamela Hayes is intended.

it had been left. He testified that the home was "inadequately designed, constructed and built, and was in the process of collapsing. . . ."

The Vogts hired a contractor to finish the house. Bills for the work and materials to complete the home were put into evidence. The Vogts borrowed approximately $36,000 more than their original construction loan of $90,000. They expended additional sums from their savings as well.[3] The sums did not include expenses for a wall that needs to be replaced, but had not yet been replaced by the time of trial because the Vogts lacked funds to pay for the repair. To tear down the current wall and replace it correctly would cost approximately $6,000.[4]

Hayes testified that had he continued working, many items that had not yet been installed in the home would have been installed as part of the finishing stage of building the house. He contended that the reason he stopped work was because he was not being paid. He also contended that the price of $89,000 was based upon the original blueprint, yet the Vogts asked for extras not included on the original blueprint, such as a second staircase in the back of the house. Hayes repeatedly stated that if the Vogts had paid him he would have finished the house as they requested. He contended that he followed the blueprint exactly, and if any structural problem existed, it was attributable not to him but to the party drawing the blueprint.

▆▆▆ Hayes raises two points on this appeal, both of which relate to the damages awarded. The trial court's judgment will be affirmed unless it has no substantial evidence to support it, it is against the

weight of the evidence, or it erroneously declares or applies the law. *KJC Development Corporation v. Land Trust of Jackson County*, 6 S.W.3d 894, 896 (Mo. banc 1999). We defer to the trial court on factual issues, and give due regard to the trial court's ability to assess the credibility of the witnesses. *Brawley v. McNary*, 811 S.W.2d 362, 365 (Mo. banc 1991). We accept the evidence and all inferences therefrom that are favorable to the trial court's judgment as true and ignore all contrary evidence. *Id.* With these standards in mind, we turn to Hayes' first point relied on.

Hayes first challenges the trial court's calculation of damages under the misrepresentation count. Hayes contends:

> The Circuit Court of Camden County erred in overruling Appellants' Motion for Directed Verdict and awarding Respondents actual damages of six thousand dollars under Count II of the Petition because the Circuit Court of Camden County did not correctly apply the law in that no evidence establishing the value of the Respondents' log home as represented versus its true value as of the date of delivery was presented and such evidence is required prior to an award of damages for fraud or misrepresentation.[5]

▆▆▆ Initially, we note that in a court-tried case, the motion filed by defendant should have been filed pursuant to the rule governing motions for involuntary dismissal and should have been designated as a motion for dismissal. *Gannon v. Nelsen*, 827 S.W.2d 278, 282 (Mo.App. S.D.1992). We further note that neither a motion for directed verdict nor a motion to dismiss

---

**3.** Because of the gaps in the pages of the transcript it is difficult to ascertain how much more money was spent.

**4.** The trial court awarded Respondents a $6,000 judgment against Moppin for a wall.

Because no exhibits were filed, we cannot determine if this is a different wall.

**5.** This was not a "delivered" home but rather a home that was constructed by Hayes.

was included in the legal file so we would have nothing to review concerning a motion for directed verdict. We thus review the award of damages.

 Hayes does not challenge the trial court's finding of misrepresentation; therefore, we will accept that finding. In essence, Hayes objects that an improper method for calculating damages must have been used by the trial court because there was no evidence of the value of the log home either as represented or as constructed. A victim of fraud has two options—he can return what he purchased and get his money back or keep what he purchased and sue for the benefit of the bargain. *Little v. Morris,* 967 S.W.2d 685, 686 (Mo.App. S.D.1998). The benefit of the bargain is the difference between the value as represented and the true value as of the date of purchase. *Id.*

 As noted above, the Vogts testified to the additional sums of money they had to spend above the original contract price to complete the house and put it into the condition it was in by the time of trial. The trial court could not have determined that the difference between the value of the house as Hayes built it versus the value if it had been made according to Hayes' representations was six thousand dollars because there was no evidence as to either of these values. The only evidence touching upon these essential facts was the testimony concerning the additional sums the Vogts had to expend to get the house into the condition it was in by the time of trial. However, there is no indication that these costs of repair represented the value of the house at either of the relevant points of the inquiry. The value of the house could be less than the cost to repair it, especially when one considers there is still a wall that needs to be repaired, and the expert engineer that examined the house recommended that the Vogts tear it down rather than repair it.

The value of the house is a factual determination that must be made by the judge after evidence is presented. We must, therefore, remand the case to allow the parties to present such evidence.

 In remanding the case, we are mindful that the Vogts have already been awarded thirty-two thousand dollars for a breach of contract. The Vogts may recover for both a breach of contract and a claim for fraudulent inducement to make a contract. *See Kincaid Enterprises, Inc. v. Porter,* 812 S.W.2d 892, 900–01 (Mo.App. W.D.1991). The Vogts are entitled to be made whole by one compensatory damage award, but not to the windfall of a double recovery. If the proven damages for both the breach of contract and for the tort are the same, then the damage award merges. *Id.*

 Hayes next argues that the trial court erred in ordering him to pay punitive damages. He contends that clear and convincing evidence of his culpable mental state that would support a punitive damage award was not presented. Although it is doubtful that the facts of this case would support an award of punitive damages as a matter of law, we need not address this issue. The setting aside of the actual damage award requires us to set aside the award of punitive damages. *Maples v. Charles Burt Realtor, Inc.,* 690 S.W.2d 202, 214 (Mo.App. S.D.1985).

For the above-stated reasons, we reverse the award of punitive damages. We also reverse the award of actual damages in the amount of $6,000 awarded under Count II and remand for retrial on the issue of damages.

BARNEY, C.J., and PREWITT, J., concur.