**William ABBOTT, d/b/a Abbott Construction, Plaintiff–Appellant,**

**v.**

**Mike HAGA, Defendant–Respondent.**

No. 24019.

Missouri Court of Appeals, Southern District, Division II.

June 25, 2002.

Mark J. Lanzotti, of Oliver, Oliver & Waltz, P.C., of Cape Girardeau, for appellant.

William B. Gresham of Richardson & Gresham, L.L.P., of Poplar Bluff, for respondent.

JAMES K. PREWITT, Judge.

William Abbott ("Appellant") appeals from a judgment in which he was awarded the balance left on a contract for the construction of a levee on Mike Haga's ("Respondent") property, but ordered to pay damages on Respondent's counterclaim for breach of contract that charged the construction was defective and completed in an unworkmanlike manner.

With two interrelated points relied on, Appellant argues that 1) the trial court's finding that the levee would eventually fail and its repair would require rebuilding was based on expert testimony that was not given to a reasonable degree of certainty, and 2) that the trial court erred in its application of the "cost rule" to calculate damages, which led to a judgment for the full cost of replacing the levee rather than a lesser amount required to repair it. We find Appellant's Point I dispositive and do not reach Point II.

In March 1999, Respondent contacted Appellant to discuss the construction of a levee.[1] Appellant submitted a bid of $5,000 for the project and agreed to accept $3,000 plus an entertainment center valued at approximately $2,000 as payment. When Appellant's father ("Millard")[2] started working at the site with a bulldozer, Respondent informed him that the levee was supposed to be in a horseshoe shape, which required Millard to spend a half-day to undo the straight levee design he had begun and switch to a horseshoe design.

On Millard's second or third day of work on the levee, Respondent told Millard that he did not like the looks of the pond and that it was too close to the house. It took Millard another half-day to make that correction and start again. Three or four days after the project began, Appellant discussed the effect of the changes on the price and informed Respondent that it would now be necessary for Appellant to keep track of the machine hours used and charge accordingly, since the modifications did not match the original design specifications, which according to Appellant, were for a straight levee. A bulldozer and excavator were used to build the levee, and Millard testified that he kept a log of his time on the bulldozer.

---

1. When referring to the project, the words levee, pond, and dam are used interchangeably.

2. As they share the same last name, we will refer to Appellant's father by his first name simply to avoid confusion. We mean no disrespect.

The construction of the pond included cutting in a spillway, which was placed on the north end of the levee. During the construction of the spillway, a sewer line was hit, which Respondent later had repaired. The project was completed by the end of March 1999, and the last 30 feet of the south end of the levee were constructed on that day. According to Appellant, Respondent started making complaints about the construction on that day. Included among Respondent's complaints were that the ground was too rough and the slope was too steep, both of which Respondent claimed would make the edges difficult to mow. Respondent also testified that he had contemplated that Appellant would "dress the banks," which would involve seeding the area or taking steps to ensure that grass would grow on the banks. Appellant agreed that Respondent made such a request when they were discussing the original bid, but that Appellant informed Respondent that it would be very difficult to get the grass to grow given the clay content in the soil.

Respondent's other major complaint was with respect to leaking, specifically that the pond leaked at the last 30 to 40 feet of the south end, or "the last part where [Appellant] had the whole thing done in six hours." From the time Appellant completed the levee until the trial, the area of seepage had never been dry. Respondent testified that the last 40 feet on the south end were 18 inches lower than the rest of the levee, including the spillway on the north end. Appellant sent Respondent an invoice dated April 7, 1999, which indicated the total cost of the project was $10,275, which was calculated based on 65 hours on the excavator (at $75 per hour) and 90 hours on the bulldozer (at $60 per hour). Appellant gave Respondent $2,016.04 credit for the entertainment center, leaving a balance of $8,258.96.

Although Respondent had never requested that Appellant build the spillway in any particular place, Respondent moved the spillway from the north end to the south end in May or June of 1999. It was moved because Respondent did not want the spillway close to the house, and also because Respondent's father-in-law informed Respondent that the south end would need to be built up to make it level with the grade of the rest of the levee. Respondent testified that the sewage overflow caused by the damage to the sewer line, and the necessity to repair that, was another factor in his decision to move the spillway to the south end. Respondent's father-in-law completed that work. Respondent testified that the leaks were not in close proximity to the newly constructed spillway.

Appellant brought action against Respondent to recover the balance due on the contract, and Respondent filed a counterclaim for breach of contract charging that the dam was defective and the construction completed in an unworkmanlike manner.[3] At trial, Respondent presented the testimony of two expert witnesses. Gary Phillips, an engineer, was not present at trial, but his testimony was entered into the record by means of his earlier deposition. Avie Richmond, an excavation expert, was present at trial and testified live.

A docket memorandum dated December 1, 2000 indicated that the trial court found in favor of Appellant on his claim for the

**3.** These documents are presented in the legal file, but are not file stamped. Neither party contests their validity; however, we call to the parties' attention Missouri Rule of Civil Procedure 81.12(a), which requires that the record on appeal be in chronological order with the dates of pleadings shown. *Kellog v. Kellog,* 989 S.W.2d 681, 686 n. 6 (Mo.App. 1999).

balance on the contract, awarding him $8,258.96. The trial court also found in favor of the Respondent on his counterclaim for breach of contract and awarded him $16,000 in damages. The trial court based its decision on evidence showing that Appellant "contracted for and completed construction of a pond for [Respondent] .... [and] that in all likelihood the levee would eventually fail and to repair same would require a complete rebuilding of the project at a cost of between $16,000.00 and $20,000.00." The trial court applied the cost rule to the calculation of damages on Respondent's counterclaim, based in part on Appellant's failure to meet his burden of showing that the repair of the levee would constitute economic waste, which would make the diminution in value test more appropriate to calculate damages. The trial court's judgment on the matter was filed December 11, 2000.

■ Appellant's first point on appeal is that the trial court erred in its finding that in all likelihood the levee would eventually fail and to repair the same would require a complete rebuilding of the project. Appellant claims that the expert testimony on which the trial court based its decision was not given to a reasonable degree of certainty and, thus, lacked evidentiary value.

Phillips, whose background in engineering and surveying included work associated with the construction of ponds or small lakes, inspected the site on two occasions in May 2000. He testified in his deposition that the levee appeared to be in a position to fail at any time and that such failure was "more eminent [sic] than not" and likely to occur "within a year." He was surprised that it had not failed already. Phillips indicated that he saw two visible leaks, one that he termed a "toe leak" and another that was higher up, which he often referred to as the "midline leak." In his opinion, while the toe leak would cause the

dam to fail eventually, it was the midline leak that would cause the entire dam to fail before the toe leak.

Phillips listed possible causes for the toe leak, a leak that he testified was historically caused by an inadequate keyway. According to Phillips, a keyway, or core trench, is a slot that connects the dam to the good material below the natural soil and can block off water seepage if constructed of good quality clay, which would make it imperious. Thus, the use of unsuitable material, which was permeable, or the improper compaction of material used, could cause a toe leak. As for the midline leak, Phillips testified that its cause was probably compaction and material related, and that, other than improper compaction or unsuitable material, there were not many more possible causes. As for whether the leaks, particularly the toe leak, could have been caused by a geological feature in the dam, such as the presence of permeable material (i.e., a rock fissure, sand seam, or gravel seam), Phillips testified that such a scenario was possible. He also agreed that it was "more likely than not" that, if such materials were present under the soil, a contractor building a dam would not have run into the material or even seen it.

Richmond, who had been involved in the construction of levees and ponds since 1972, also inspected the site and testified at trial. He testified that the leaks he saw were not of the type that one would expect to find in a dam that was 15–18 months old. Since he was not sure what type of material was in and around the core trench, Richmond indicated that he could only speculate as to what factor was "not right" or causing the leak. On cross-examination, Richmond admitted that geological factors could sometimes cause levee instability and that it was possible that this levee could have tied into a sand or gravel

seam. He also testified that he could not tell with any certainty when the levee will fail, or if it will fail.

On rebuttal, Appellant also called an expert, Ralph Kelsick, who had formerly worked for the Soil Conservation Service where he supervised pond construction as part of his duties. He testified that the leaks on the south end of the levee were similar to those he had seen in other levees and that it can take one to four years for a pond to settle. He also testified that if there was not good quality clay used in the core trench, that could cause a levee to leak. As for failure of the levee, Kelsick testified that, regardless of the cause of the leaks, the dam was not going to fall over within a year, and might last more than 10 years.

■ In a court-tried case, we will affirm the trial court's judgment unless it has no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Vogt v. Hayes*, 54 S.W.3d 207, 210 (Mo. App.2001). Due deference is given to the trial court's ability to judge the credibility of the witnesses. *Id.*

■ Respondent argues that Appellant's point is not preserved because no objection was made at trial to the testimony of Phillips and Richmond regarding the causes of the leaks or the propensity of the levee to fail. However, there is a distinction between the admissibility and the submissibility of expert testimony. *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 616 (Mo. banc 1995). When a question is raised as to whether the proffered opinion testimony of an expert is based on sufficient factual or scientific foundation, then the issue is admissibility. *Id.* In that situation, the question must be raised by a timely objection or motion to strike. *Id.* In the case at bar, the issue is not one of admissibility, but rather one of submissibility, under which situation the probative value of the testimony is a consideration for the trier of fact, and it is not necessary to preserve the point by a timely objection or motion to strike. *See id.*

■ Appellant does not argue in this point that the expert testimony presented by Phillips and Richmond was not based on sufficient factual or scientific foundation. Rather, Appellant argues that the testimony regarding the causes and purported eventual failure of the levee was not given to a reasonable degree of certainty. Numerous cases, mostly tort cases involving medical malpractice, wrongful death, and products liability claims, clearly establish and apply the principle that "[w]hen a party relies on expert testimony to provide evidence as to causation when there are two or more possible causes, that testimony must be given to a reasonable degree of certainty." *Tompkins v. Cervantes*, 917 S.W.2d 186, 189 (Mo.App.1996); *see also Super v. White*, 18 S.W.3d 511, 516 (Mo.App.2000); *Sanders v. Hartville Milling Co.*, 14 S.W.3d 188, 201 (Mo.App. 2000). Further, "[w]hen an expert merely testifies that a given action or failure to act 'might' or 'could have' yielded a given result, though other causes are possible, such testimony is devoid of evidentiary value." *Tompkins*, 917 S.W.2d at 189.

■ Although it may be arguable as to whether the exact phraseology of "reasonable degree of certainty" is necessary, language that is equivocal will not rise to the level necessary for consideration of the evidence by the trier of fact. *See Sanders*, 14 S.W.3d at 201. The principle has been utilized in contract cases as well in "[t]hat evidence is of no probative value and does not satisfy the purpose for which it is admitted if the opinion of the expert is couched in terms of 'might or could'." *Shackelford v. West Cent. Elec. Co-op.*,

*Inc.,* 674 S.W.2d 58, 62 (Mo.App.1984). "Evidence by the expert that the act or omission of the party charged was a positive factor or was extremely likely to have had a causal effect is not sufficient to make a submissible case." *Id.*

■ Neither the testimony given by Phillips nor Richmond was unequivocal in terms of the causes of the leaks. Both admitted that a cause outside of Appellant's control, such as geological factors, could have been the source of the leaks. Richmond testified he was unable to tell to any degree of certainty when, or if, the levee would fail. Although Phillips may have used language that was beyond "might" or "could have" with respect to the eventual failure of the levee, he also testified that it was the leaks that would lead to that failure. With equivocal language used with respect to the causes of those leaks, Respondent was unable to make a submissible case for breach of contract because his damages were not proven to have resulted from Appellant's breach.[4]

Therefore, as the trial court's judgment for Respondent on his counterclaim, and subsequent award of $16,000 in damages, was based on a finding that the evidence showed that in all likelihood the levee would eventually fail and that Appellant's faulty construction and unworkmanlike manner caused the damages, the trial court's finding and judgment for Respondent on his counterclaim was in error.

The judgment is affirmed on the determination on Appellant's petition and reversed on the portion of the judgment finding for Respondent on his counterclaim. The cause is remanded to the trial court for it to set aside the portion of the judgment in favor of Respondent on his counterclaim and amend the judgment to deny Respondent any relief on his counterclaim.

PARRISH, J., and RAHMEYER, J., concur.

---

4. "To make a submissible case for a breach of contract claim, a party must allege and prove: (1) mutual agreement between parties capable of contracting; (2) mutual obligations arising out of the agreement; (3) valid consideration; (4) part performance by one party; and (5) damages resulting from the breach of the contract." *Fidelity Nat'l Ins. Co. v. Tri–Lakes Title Co., Inc.,* 968 S.W.2d 727, 730 (Mo.App. 1998).