LEO JOURNAGAN CONSTRUCTION
COMPANY, INC., Plaintiff–
Appellant,

v.

CITY UTILITIES OF SPRINGFIELD,
MISSOURI, Defendant–Respondent–
Cross–Appellant.

Nos. 24768, 24772, 24787.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 1, 2003.

Stephen R. Miller and Michael T. Metcalf, Miller Law Firm, P.C., Kansas City, MO, for Appellant.

David Frensley and Dennis Owens, Kansas City, MO, for Respondent/Cross-Appellant.

JAMES K. PREWITT, Judge.

Leo Journagan Construction Company ("JCC") sued City Utilities of Springfield, Missouri ("CU") for damages related to the construction of a pipeline. Following a four-week trial, the jury found in favor of JCC on all three counts submitted to it, including breach of contract due to interference, breach of contract for failure to pay for rock excavation, and breach of implied warranty *ex contractu* (Ideker claim). The trial court granted CU a new trial on the breach of contract counts and granted it a judgment notwithstanding the verdict on the Ideker claim. The trial court also reiterated previous directed verdicts in favor of CU on two remaining counts based on theories of quantum meruit and a violation of the Prompt Pay Act,

§ 34.057, RSMo 1994.[1]

JCC filed a notice of appeal (No. 24768) after the trial court's orders described above were reflected in a docket entry. CU filed a cross appeal (No. 24772) a few days later. JCC filed a second notice of appeal (No. 24787) after the trial court entered a "Judgment and Order" in which it supplied reasons for the orders that were not provided in the previous docket entry. As detailed below, we affirm the trial court's actions and dismiss CU's cross appeal as well as JCC's second appeal.

## FACTS

In 1995, CU invited bids for the construction of a pipeline to transport water from Stockton Lake to Fellows Lake ("the Project") to provide an additional water supply for the City of Springfield. The Project was bid as two separate contracts, the first involving the construction of 13.5 miles of pipeline from Stockton Lake to the Greene County line and the second the remaining 16.6 miles from the Greene County line to Fellows Lake, on the northeast edge of Springfield.[2]

JCC was the low bidder for both contracts and the Project was awarded to the company on March 29, 1995. Pursuant to the contracts, which were executed in April 1995, JCC agreed to construct the 30.1–mile pipeline and CU agreed to pay JCC a lump sum of $16,496,000, which included a $50,000 deduction because JCC was awarded both contracts. In addition to the lump sum payment, the contracts provided that CU would pay JCC $25 per cubic yard for rock removed during the pipeline construction.

The contracts required that work on the Project be completed within 400 days of the notice to proceed, which was issued on April 19, 1995. The pipeline was completed on May 17, 1996. CU paid JCC the lump sum contract price plus $787,700 for excavation of 31,508 cubic yards of rock. Based on JCC's request, CU held back $1,000 from the amounts paid so that JCC could reserve its right to claim additional compensation.

JCC filed two claims with CU requesting additional compensation. One for alleged disruption and interference on CU's part during JCC's performance of the contract, and the second for payment for rock excavation beyond the 31,508 cubic yards. CU denied the claims.

On December 28, 1998, JCC filed suit against CU. The petition contained five counts that asserted the following claims: breach of contract for interference and failure to pay for additional rock excavation, quantum meruit, breach of warranty relating to plans and specifications of contract that led to drilling and blasting of rock for which JCC was not paid, breach of contract *ex contractu* also related to the rock excavation, and violation of the Prompt Pay Act.[3]

The first trial began in November 2000; however, a mistrial was declared because "[c]ounsel and court [were] unable to impanel jury panel." The trial at issue here was held in October and November 2001.

1. What the parties term the Ideker claim is based on *Ideker, Inc. v. Missouri State Highway Comm'n*, 654 S.W.2d 617 (Mo.App.1983).

2. City Utilities is part of the municipality of the City of Springfield, Missouri that provides electricity, natural gas, water, and public transportation services under the direction of the Board of Public Utilities.

3. CU also filed a counterclaim against JCC and a third-party claim against United States Fidelity and Guaranty Company, both of which were dismissed before the trial considered here.

The trial court directed verdicts on the quantum meruit and Prompt Pay Act counts. Three claims were ultimately presented to the jury, including breach of contract due to interference, breach of contract for failure to pay for rock excavation, and breach of implied warranty *ex contractu*. The jury returned verdicts in favor of JCC on all three counts and awarded damages as follows: $2,385,506 for breach of contract due to interference, $2,545,550 for breach of contract for failure to pay for rock excavation, and $2,545,550 for breach of implied warranty *ex contractu*.[4]

CU filed separate motions for new trial and judgment notwithstanding the verdict (JNOV) on the three counts on which the jury returned a verdict. A hearing was held on the motions on February 7, 2002. After hearing arguments on the motions, the trial court first restated that it had directed verdicts on Counts II and V, the quantum meruit and Prompt Pay Act claims, respectively. The trial court then granted CU's motion for JNOV on Count IV, the Ideker claim or breach of implied warranty *ex contractu*. Finally, "based upon the actions of [JCC], the lack of the evidence to support an award of $5 million, [and] the confusing verdict of the jury concerning the three counts," the trial court granted CU's motion for new trial.

On February 11, 2002, a docket entry was made that reflected the results of the hearing on post-trial motions, which read, in pertinent part:

> [T]he [c]ourt granted a directed verdict once again on Counts II and V of [JCC's] Petition; the [c]ourt granted [CU's] Motion for Judgment Not Withstanding the Verdict as to Count IV (the Ideker Claim); the court does grant [CU's] Motion for New Trial as to Counts I and III.

Per the trial judge's request, and pursuant to local rules, the case was transferred to the presiding judge for reassignment.

A few days after the docket entry was made, JCC filed its first notice of appeal. On February 21, 2002, another docket entry indicates that the presiding judge reassigned the case back to the trial judge "for entry of a formal judgment." In a subsequent docket entry also dated February 21, 2002, the trial judge stated that "the court does hereby enter its formal judgment and order granting [CU's] motion for new trial." The Judgment and Order outlines the court's rulings on the various post-trial motions and expresses the reasons for the grant of the new trial on Counts I and III that had been orally stated an the motion hearing.[5]

CU filed its cross appeal on February 22, 2002, and JCC filed a second notice of appeal on February 27, 2002. Additional facts necessary to the disposition of the case are included below as we address the issues on appeal.

---

4. JCC concedes that, although it had the right to recover under both the breach of contract for failure to pay for rock excavation and breach of implied warranty *ex contractu* claims, the damage awards for those two verdicts would merge so that JCC would not receive the windfall of a double recovery. *See Vogt v. Hayes*, 54 S.W.3d 207, 211 (Mo.App. 2001).

5. We make a note here about Count III. In JCC's petition, it is listed as a breach of warranty claim. However, as it was submitted to

the jury and subsequent decisions made regarding it, including the jury's verdict and the grant of new trial, the parties and the trial court appear to have considered Count III as a claim for breach of contract for failure to pay for rock excavation. The parties continue to treat it that way on appeal and do not acknowledge any potential discrepancy and thus, we will analyze any arguments referencing Count III as presented. *See Unnerstall Contracting Co., Ltd. v. City of Salem*, 962 S.W.2d 1, 5–6 (Mo.App.1997).

## CU's CROSS APPEAL

CU raises two points in its cross appeal. The points refer to the trial court's decision to grant a new trial on Counts I and III, thereby denying CU's motion for JNOV on the same counts, which were breach of contract due to interference and breach of contract for failure to pay for rock excavation. CU contends it was error for the court to deny JNOV on the counts. CU addresses each count in a separate point.

■ The trial court's order granting a new trial on these two counts (which, when we address JCC's points on appeal, will be shown to be valid) removed any adverse judgment against CU on the counts. *Trinity Lutheran Church v. Lipps*, 68 S.W.3d 552, 556 (Mo.App.2001). Therefore, CU is not an aggrieved party and its cross appeal must be dismissed. *Community Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 370 (Mo.banc 1990).

## SUBMISSIBILITY OF JCC'S BREACH OF CONTRACT CLAIMS

■ However, we agree with CU that it has consistently disputed the submissibility of the two claims in post-trial motions and in its response to JCC's appeal of the trial court's grant of a new trial. Based on JCC's appeal, CU is permitted to challenge the submissibility and we are permitted to determine whether JCC made a submissible case on the two counts. *Id.* at 370–71. If JCC failed to make a submissible case, the trial court's order for new trial for Counts I and III must be reversed and the cause remanded with directions for the trial court to enter a JNOV. *Id.* at 371.

In analyzing whether JCC made submissible claims on the two breach of contract counts, we use the same standard of review that we would if reviewing the denial of CU's motion for JNOV on these counts. We view the evidence in the light most favorable to JCC, giving it all reasonable beneficial inferences from that evidence, and ignoring all evidence that is to the contrary. *Resnik v. Blue Cross & Blue Shield of Missouri*, 912 S.W.2d 567, 570 (Mo.App.1995); *see also Community Title*, 796 S.W.2d at 371. We presume that JCC's evidence is true. *Carter v. St. John's Reg'l Med. Ctr.*, 88 S.W.3d 1, 8 (Mo.App.2002).

■ Counts I and III were each submitted to the jury as breach of contract claims; thus, the essential elements we will consider for submissibility are the same. To make a submissible case for breach of contract, a party must establish: (1) mutual agreement between parties capable of contracting; (2) mutual obligations arising out of the agreement; (3) valid consideration; (4) part performance by one party; and (5) damages resulting from the breach of contract. *Bowles v. All Counties Inv. Corp.*, 46 S.W.3d 636, 641 (Mo.App.2001). JCC must present substantial evidence to support each element. *Carter*, 88 S.W.3d at 8.

*Submissibility of breach of contract due to interference claim.*

■ CU does not dispute that JCC established the first four elements for the breach of contract due to interference claim. CU's argument against the submissibility of this claim is that JCC failed to prove that a breach occurred and that damages resulted from such a breach. We disagree.

The contracts for the Project included specifications that the backfill was not to exceed four inches "within 12 inches of pipe or conduit and upper 18 inches of trench." JCC presented evidence that CU representatives on the Project required

JCC to maintain a four-inch or less backfill of rock for the entire trench, including areas that were outside the 12–inch or 18–inch specifications.

Another contract provision specified that "[t]he maximum length of disturbed area along the pipeline will be limited to 3 miles including clearing, blasting, pipe installation." The language of the contract does not indicate whether restoration efforts that took place after pipe installation would be included in the three-mile limitation. JCC presented evidence that CU imposed the limit on restoration activities, causing JCC to suspend work on areas specified in the provision in order not to exceed the three-mile limitation.

JCC also presented evidence that CU prevented it from deflecting pipe joints up to five degrees, as allowed by manufacturer's specifications. According to JCC's evidence, CU often precluded JCC from using a pipe deflection of more than two or three degrees. Additional evidence was presented that CU rejected several hundreds of sections of pipe, most of which was later accepted and installed.

For the alleged instances of interference with JCC's performance of the contract described above, JCC presented evidence of extra costs for the Project attributable to them. JCC also presented the testimony of an expert on construction productivity who analyzed JCC's data on alleged disruptions and loss of productivity. The expert calculated a loss of productivity amount of between $1.8 million and $2 million, and noted that JCC's calculation of damages of $2.3 million due to the interference was reasonable and valid.

Given our standard and the evidence JCC presented, it made a submissible case on its claim of breach of contract due to interference.

*Submissibility of breach of contract for failure to pay for rock excavation claim.*

Similar to the breach of contract due to interference, CU does not dispute that JCC established the first four elements for the breach of contract for failure to pay for rock excavation claim. CU's argument against the submissibility of this claim is that JCC failed to prove that a breach occurred and that damages resulted from such a breach. We disagree here as well.

As indicated previously, the contract for the Project indicated that JCC would be paid for rock excavation at a rate of $25 per cubic yard. The particular rock at issue was limestone, and the contract provided that "[l]imestone will be measured from the top as evidenced from drilling logs where white powder is noted during drilling to a point 2.60 feet below the centerline of the pipeline as indicated on the Contract drawings." JCC's argument at trial was that CU failed to pay JCC for all of the limestone drilled and blasted.

The appropriateness and method of the "white dust" test was an issue at trail. JCC presented evidence that whether white dust would appear or whether the dust would have a white color could be affected by several items, including how wet the rock was, how the drilling was accomplished, and other geological factors.

JCC presented evidence that inspectors from CU failed to accurately note the top of the rock when using this test or were not available when drilling was ongoing to log any white dust or the top of a rock. According to JCC's evidence, the contract provided that the resident engineer on the Project was required to measure and calculate the volume of rock, and sign the drill logs; however, in practice, the process did not always follow those procedures.

Regarding damages, JCC's evidence was that it could calculate the amount of limestone actually excavated by using data on the amount of explosives used and the number of holes drilled. Taking into account overbreakage of rock and re-blasting used for "high rock," JCC's estimate was that the total amount of limestone excavated was 133,330 cubic yards, which was 101,822 more than the cubic yards for which JCC was paid. JCC provided expert testimony verifying those calculations.

Under the standard outlined above, JCC met its burden and made a submissible case on its claim of breach of contract for failure to pay for rock excavation.

### JCC's APPEAL

We now address JCC's points on appeal. Within this section, our reasoning for dismissing JCC's second appeal will be explained.

*Point I: The trial court's order granting a new trial was presumptively erroneous.*

JCC makes several contentions within this point, the first of which refers to the docket entry from February 11, 2002 that reflected the trial court's decisions on post-trial motions, specifically that it reiterated the directed verdicts on Counts II and V, granted CU's motion for JNOV on Count IV, and granted CU's motion for a new trial on Counts I and III. We agree with JCC that the docket entry lacks any listing of specific grounds for the trial court's order of a new trial. JCC argues that the new trial order was therefore presumptively erroneous as it was in violation of Rules 78.03 and 84.05(d).

According to Rule 78.03, "[e]very order allowing a new trial shall specify *of record* the ground or grounds on which said new trial is granted" (emphasis added). Rule 84.05(d) states that "[i]f a trial court grants a new trial without specifying discretionary grounds, it shall never be pre-

sumed that the new trial was granted on any discretionary grounds."

■ The purpose of Rule 78.03 is to define and limit the issues cognizable on appeal. *Hightower v. Hightower,* 590 S.W.2d 99, 103 (Mo.App.1979). Although JCC only references paragraph (d) of Rule 84.05, when Rule 78.03 is violated, typically Rule 84.05(c) is implicated, which states:

> When a trial court grants a new trial without specifying of record the ground or grounds on which the new trial is granted, the presumption shall be that the trial court erroneously granted the motion for new trial and the burden of supporting such action is placed on the respondent. In such event if the appellant serves on the respondent a statement requesting that respondent prepare the original brief on or before the time when the record on appeal is filed, the respondent shall file the original brief and reply brief, if any, and serve them within the time otherwise required for the appellant to serve briefs. The appellant shall prepare the answer brief and serve it in the time otherwise requires for the respondent to serve the respondent's brief.

We note that the procedure outlined in the rule leading to the respondent filing the original brief was not followed here, but that does not affect our analysis.

■ Rather, our analysis is focused on the phrase "of record" in Rule 78.03. Under longstanding Missouri law, if an order granting a new trial is ambiguous, it is appropriate for an appellate court to look to other places on the record to find explanation or support for the order. *Land Clearance for Redevelopment Auth. of City of Joplin v. Joplin Union Depot Co.,* 429 S.W.2d 806, 808–09 (Mo.App.1968). In *Land Clearance,* it was proper for the

Court to consider an accompanying memorandum to the order. *Id.* at 809.

Other cases are closer to the facts of the case at bar in that there was no accompanying memorandum, but oral statements made at the hearing on the post-trial motions. *See Hightower,* 590 S.W.2d at 100; *Pasalich v. Swanson,* 89 S.W.3d 555, 557 (Mo.App.2002). In *Hightower,* it was determined that because the grounds upon which the new trial was granted could be found in the oral statements from the hearing, the grounds thus clearly appeared from the record. 590 S.W.2d at 103. Such evidence rebutted the presumption stated in Rule 84.05(c). *Id.* The same conclusion was reached in *Pasalich,* 89 S.W.3d at 559.

Thus, we now look to the trial court's comments at the hearing at which CU's motion for new trial was granted for Counts I and III. We pick up the court's comments at the point at which the trial judge began discussing CU's motion for new trial.

Now, I think that the judge's duty, the main duty in any trial is to try to make sure that there is a fair trial that occurs and that both sides are going to say, Well, we wish this had gone our way or something had gone one way or the other. I'd be surprised if there's ever been a case tried it [sic] which both parties walked out and thought they got everything they wanted and still called it a fair trial.

It's my responsibility to make sure both sides get that fair trial. In doing that, the [c]ourt listens to the evidence, the testimony, the demeanor of the witnesses, the trial strategy of the parties. In this case, I was waiting for evidence to be presented to support the plaintiff's claim of over $5 million total. I never really heard any substantial evidence to substantiate that $5 million claim; therefore, I was somewhat perplexed when the jury returned a verdict of over $5 million.

It also bothered me and perplexed me that the plaintiff's attorneys would repeatedly—and this issue had actually come up in the previous motion in limine and in the previous trial we had, issue about the shareholders and the individuals at stake from the plaintiff's side, but the plaintiff's attorney tried to interject the plaintiff's personal lives into this trial on more than just the two occasions in closing. I think that was the end of the time. In fact, we went in the conference room on one of those in closing and I made my ruling, which had been consistent even before and during the trial.

I became convinced during the closing arguments that the plaintiff's attorneys had interjected the personal lives of the plaintiff into the trial way too often even after I had ruled it was not admissible. At that point I did not think that the defendant had received a fair trial and that is why I took the motion for mistrial under advisement.

The plaintiffs must have also thought it was an important point or issue because they kept interjecting it even after I had ruled on it the first time. So it— that showed me that they thought it was an important issue that those statements be made to the jury. After reading the jury's verdicts, I was convinced that this issue had to have swayed the jury to the prejudice of the defendant.

Therefore, based upon the actions of the plaintiff, the lack of evidence to support an award of $5 million, the confusing verdict of the jury concerning the three counts, the [c]ourt does hereby grant the defendant's motion for new trial and requests the circuit clerk to assign this case pursuant to local court rule.

■ Under the standard outlined in *Hightower* and *Pasalich,* the oral statements at the hearing provided the grounds for the new trial that were absent from the February 11, 2002 docket entry. The grounds were thus clearly specified *of record* as required by Rule 78.03.

Therefore, the actions of the presiding judge in reassigning the case to the trial judge for the entry of a final judgment and order, and the actions of the trial judge in following those directions, were unnecessary. The February 11, 2002 docket entry was valid and appealable. Thus, JCC's first notice of appeal was valid as well and its second notice of appeal, made after the trial court issued its judgment and order on February 21, 2002, was unnecessary.

JCC's second appeal is dismissed and Point I denied.

*Point II: The trial court erred and abused its discretion in granting a new trial on the basis of allegedly improper evidence or argument about the plaintiff's personal lives.*

Prior to the trial at issue here, the trial court heard arguments on CU's motion in limine and "ruled that [JCC was] not to interject the information about the stockholders or the indemnitors of the bond in the case."

During JCC's opening statement, CU objected when JCC's attorney began discussing Leo Journagan, his wife, and his son, Allen, in regard to starting the business. The court sustained the objection and, during further discussion of the issue that took place in a conference room, the court reiterated that it was sustaining the motion and explained:

You're giving a personal history of Leo Journagan so they will empathize, the jury will empathize with Leo Journagan and Allen Journagan as individuals and not as the corporation and that's what

was objected to. That's what I'm sustaining.

During JCC's closing argument, CU objected to the following statement from JCC:

What you do today is important to all of the parties, to City Utilities and to Journagan. And it will be one of the most significant days in the lives of the parties. You can imagine those that sit on this side of the jury rail, how they feel about today. That will be especially true for a family business like [JCC]. For Leo Journagan, the patriarch, what happens today will validate the past for him, stamp it indelibly—

CU objected that the statement was prejudicial, reminding the court that the case was between CU and JCC as a corporation, and therefore, did not "pertain to individual shareholders or the family that's involved." The trial court sustained the objection.

Later in its closing argument, as JCC was telling the jury about "certain individual witnesses . . . . [and] memorable moments," the following was stated:

I'll remember Allen Journagan, who was our first witness in the case testifying. I'll remember him being proud of his company and all that his father had accomplished. I'll remember him being worried that he might lose everything when he wasn't being paid.

The trial court sustained CU's objection to the remarks.

After JCC concluded the initial portion of its closing argument, CU moved for a mistrial based on the incidents noted above. Rather than rule on the motion immediately, the trial court indicated it would "take it under advisement and . . . rule on it at the end of the case." There was no discussion about the motion for mistrial until the hearing on the post-trial

motions. At that time, the trial judge overruled the motion, but also noted that "case law seems to state that I should have ruled at that time and didn't and it's therefore moot, just to clean up the record, I'll overrule the motion for mistrial."

Our review of the grant of a motion for new trial differs from the review of a denial of a motion for new trial in that we are more liberal in upholding the grant of a new trial than a denial. *Lowdermilk v. Vescovo Bldg. & Realty Co., Inc.*, 91 S.W.3d 617, 625 (Mo.App.2002). On appeal, this Court must indulge every reasonable inference that favors that trial court's decision in granting the new trial. *Mason v. Wal–Mart Stores, Inc.*, 91 S.W.3d 738, 741 (Mo.App.2002).

We will not reverse unless there has been a clear abuse of discretion. *Lowdermilk*, 91 S.W.3d at 625. An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration on the part of the court. *Id.* If reasonable people can differ about the propriety of the action taken by the trial court, the trial court will not be found to have abused its discretion. *Id.*

The trial court's opportunity to appraise the impact of an argument on a jury is far superior to ours. *MFA Inc. v. Dettler*, 817 S.W.2d 658, 663 (Mo.App. 1991). For that reason, a trial court has broad discretion, particularly in the area of closing arguments. *Id.*

The trial judge here not only heard the statements made by JCC during closing argument, but also was better able to take them in context with the statements made during opening argument and the ruling on the motion in limine prior to trial. *See Giddens v. Kansas City South-*ern *Ry. Co.*, 937 S.W.2d 300, 309 (Mo.App. 1996). The prejudicial impact of the totality of those statements and JCC's conduct in continuing to make them, was something well within the trial court's discretion to evaluate. *Id.* We cannot find that the trial court abused its discretion in this regard.

JCC also argues within this point that CU either failed to object or its objections were sustained; thereby causing CU to fail to preserve the issue as proper grounds for a new trial. However, even if CU did fail to timely move for a mistrial, which we need not decide, the trial court has discretion to grant a new trial when it finds error, whether or not it was timely raised. *Whitted v. Healthline Mgmt., Inc.*, 90 S.W.3d 470, 478 (Mo.App.2002). It is only necessary that the error complained of be prejudicial to the party seeking the new trial, which in this case the trial court could find it was. *Lowdermilk*, 91 S.W.3d at 625.

Point II is denied.

*Point III: The trial court erred and abused its discretion in granting a new trial on the basis of a purported lack of evidence to support a verdict of $5 million.*

*Point IV: The trial court's order granting a new trial on the basis on a "confusing verdict of the jury concerning three counts" is presumptively erroneous.*

Our analysis of JCC's Point II is dispositive to Points III and IV. We need not consider the other grounds assigned by the trial court to grant the new trial. When the trial court assigns several grounds for the grant of a new trial, the action must be upheld on appeal if any one of the grounds is valid. *Kindle v. Keene*, 676 S.W.2d 82, 85 (Mo.App.1984). A single ground of error, if prejudicial, appropriately warrants the grant of a new trial.

*McTeer v. Clarkson Constr. Co., Inc.,* 807 S.W.2d 174, 185 (Mo.App.1991).

Points III and IV are denied.

*Point V: The trial court erred in granting the motion for JNOV on Count IV.*

■ Count IV was JCC's claim for breach of implied warranty *ex contractu,* which related to alleged representations made with regard to the rock excavation. In our review of the trial court's actions, we will affirm the grant of JNOV only if JCC failed to make a submissible case. *Faust v. Ryder Commercial Leasing & Services,* 954 S.W.2d 383, 387 (Mo.App. 1997). In determining whether a submissible case was made, we view the evidence in the light most favorable to JCC, giving it the benefit of all reasonable inferences that can be drawn from the evidence, disregarding all unfavorable evidence and inferences. *Id.* at 388. There is a presumption that favors reversal of a JNOV granted to a defendant, unless the favorable evidence and inferences are so strongly against the plaintiff as to leave no room for reasonable minds to differ as to the result. *Id.*

■ To make a submissible case for breach of warranty *ex contractu,* a party must establish (1) a positive representation by a governmental entity; (2) of a material fact; (3) that is false or incorrect; (4) lack of knowledge by a contractor that the positive representation of the material fact is false or incorrect; (5) reliance by a contractor on the positive representation of a material fact made by the governmental entity; and (6) damages sustained by a contractor as a direct result of the positive representation of a material fact made by the governmental entity. *Ideker,* 654 S.W.2d at 621.

■ We note first that this claim was referred to by JCC in its petition as a breach of implied warranty *ex contractu,*

and that wording also appears on the verdict form. Including with it the word "implied" was a misnomer. This cause of action covers positive or affirmative representations, which are actionable, but distinguishes those types of representations from ones that are merely implied or suggestive. *St. Louis Air Cargo Services, Inc. v. City of St. Louis,* 929 S.W.2d 821, 826 (Mo.App.1996). Under Missouri law, implied representations are not sufficient. *Missouri Consol. Health Care Plan v. Community Health Plan,* 81 S.W.3d 34, 41 (Mo.App.2002). The correct wording, breach of warranty *ex contractu,* was used on all other applicable jury instructions, and since there is no allegation that any representation was implied or suggestive rather than positive or affirmative, JCC's misnomer will not affect our analysis.

■ The positive representations considered under a breach of warranty *ex contractu* claim are those that are made and relied on by a contractor in calculating its bid. *Ideker,* 654 S.W.2d at 621. Such representations, if they turn out to be false and lead to additional expense for the contractor, force the contractor into the position of having undertaken one contract, but being confronted with performance of another contract. *Id.*

The jury was instructed to consider, among other elements under *Ideker* and per a verdict director submitted by JCC, whether CU "made a positive representation to [JCC] that the top of rock could be determined by noting the appearance of white dust produced when drilling[.]" In its grant of CU's motion for JNOV on this count, the trial court stated that JCC failed to make a submissible case because "there was no evidence of a positive misrepresentation as to the amount of rock that could be—would be paid for in the contract."

JCC argues that CU raised issues in its motion for JNOV that were beyond those raised in its motion for directed verdict and that such issues may not be used to seek a JNOV. We agree that issues not raised in a motion for directed verdict, but raised in the motion for JNOV, are not preserved for appellate review of the motion for JNOV. *Carter*, 88 S.W.3d at 11–12. In its motion for directed verdict, CU argued that it did not make a positive misrepresentation, which was among the issues raised in its motion for JNOV. That is the only issue necessary for the analysis.

 The contract indicated that "[l]imestone will be measured from the top as evidenced from drilling logs where white powder is noted during drilling to a point 2.60 feet below the centerline of the pipeline as indicated on the Contract drawings." That contract provision makes no representation as to the appropriateness of measuring the amount of limestone in the manner noted. It simply states that what has been termed the "white dust test" would be used to determine the top of the rock.

Thus, we would agree that no positive representation was made regarding how the top of the rock "could" be determined. Further, we agree with the trial court that no positive representation or misrepresentation was made in that nothing in the contract provision stipulated the amount of rock that would be paid for according to the contract; it only stipulated the procedure for measuring compensable rock. Even if positive representations were made, none of them were misrepresentations—none of them were false or incorrect.

JCC failed to make a submissible case on the claim of breach of warranty *ex contractu;* thus, the JNOV was appropriate. Point V is denied.

*Point VI: The trial court erred in directing a verdict on JCC's claim brought under the Prompt Pay Act, § 34.057, RSMo 1994.*

Within this point, JCC contends that CU was in violation of the Prompt Pay Act for its failure to pay JCC for rock excavation beyond 31,508 cubic yards.

When reviewing the trial court's decision to grant a directed verdict for CU on the Prompt Pay Act claim, we view the evidence and all permissible inferences in the light most favorable to JCC, disregarding any contrary evidence and inferences to determine whether JCC made a submissible case. *Schmidt v. Director of Revenue*, 48 S.W.3d 688, 690 (Mo.App.2001). A submissible case is made when each and every fact essential to liability is predicated upon legal and substantial evidence. *Seippel–Cress v. Lackamp*, 23 S.W.3d 660, 666 (Mo.App.2000). Substantial evidence is that which, if true, is probative on the issues, and is evidence from which the trier of fact can reasonably decide the case. *Id.*

 Directing a verdict is a drastic remedy and there is a presumption that works in favor of reversing the trial court's granting of a motion for directed verdict. *Id.* We will reverse the grant of the directed verdict unless the facts and any reasonable inferences are so strongly against JCC as to leave no room for reasonable minds to differ as to a result. *Morehouse v. Behlmann Pontiac–GMC Truck Service, Inc.*, 31 S.W.3d 55, 57 (Mo.App.2000). Therefore, if we find reasonable grounds to support the directed verdict, we will affirm the trial court's decision. *Seippel–Cress*, 23 S.W.3d at 666.

The Prompt Pay Act promotes timely payment of contractors, subcontractors, and suppliers on contracts with public owners for public works construction projects. *Environmental Protection, Inspec-*

*tion, Consulting, Inc. v. City of Kansas City,* 37 S.W.3d 360, 369 (Mo.App.2000). The threshold requirements of the act are the payment due dates, which are the events that trigger the remedies available for untimely payment. *Id.* at 370.

 The Prompt Pay Act is considered a remedial statute and therefore requires liberal interpretation. *Long v. Interstate Ready–Mix, L.L.C.,* 83 S.W.3d 571, 574 (Mo.App.2002). However, similar to a claim for vexatious refusal to pay, a claim under the Prompt Pay Act should not be submitted to the jury unless there is evidence of a substantial nature indicating that the defendant acted in bad faith and without reasonable cause. *City of Independence for Use of Briggs v. Kerr Constr. Paving Co., Inc,* 957 S.W.2d 315, 321 (Mo.App.1997).

Under § 34.057.1(8), RSMo 1994, the public owner must make final payment of all moneys owed to the contractor within thirty days of the due date. The final payment due date arrives when the project is complete or when the proper authority certifies that the project is complete and upon filing with the public owner of all documentation and certifications required by the contract in complete and acceptable form. *Environmental Protection,* 37 S.W.3d at 370.

 The evidence here was that JCC was paid the lump sum due on the contract plus an amount reflecting 31,508 cubic yards of rock excavation, less $1,000 that it had asked CU to hold back so that JCC could reserve its right to claim additional compensation. The evidence also showed that, under the contract for the Project, "[f]inal payment [was] contingent on receipt of affidavits showing prevailing wage compliance." JCC never provided those.

We question whether evidence of a substantial nature was presented that indicated that CU acted in bad faith and without reasonable cause in not paying the additional amount for rock excavation JCC alleged it was owed. However, we need not decide that issue because the evidence provides reasonable grounds to support the directed verdict in that JCC failed to follow the procedures outlined in the Prompt Pay Act, and thus, its remedies were not triggered.

Point VI is denied.

*Point VII: The trial court erred in failing to enter judgment on the jury's verdict and in failing to award pre-judgment interest on the damages awarded by the jury in accordance with § 408.020, RSMo 1994.*

The first part of JCC's Point VII, in which it argues that the trial court erred in failing to enter judgment on the jury's verdict is rendered moot due to the analysis of previous points.

In the second part of the point, JCC argues that the trial court erred in not awarding pre-judgment interest on the damages awarded by the jury in accordance with § 408.020, RSMo 1994. Under that statute, "[c]reditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made[.]" A party is entitled to pre-judgment interest under § 408.020, RSMo 1994, on damages for breach of contract if the amount is liquidated or readily ascertainable by reference to recognized standards. *Midwest Asbestos Abatement Corp. v. Brooks,* 90 S.W.3d 480, 486 (Mo.App.2002).

 Similar to the first part of this point, the other points on appeal are dispositive to the second part of Point VII as well. Given the grant of a new trial on the breach of contract claims, the judgment

against CU and the resulting damage awards were erased. *Trinity Lutheran Church,* 68 S.W.3d at 556.

## CONCLUSION

For the reasons stated above, the decisions of the trial court are affirmed.

SHRUM and GARRISON, JJ., concur.