Brown HARRIS, II, Trustee for
the Christopher Harris
Trust, Appellant,

v.

The MISSOURI DEPARTMENT OF
CONSERVATION, Defendant.

No. WD 48200.

Missouri Court of Appeals,
Western District.

Jan. 17, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 28, 1995.

Application to Transfer Denied
April 25, 1995.

---

Michael T. White, Timothy J. Sear, Mark F. Brady, Kansas City, for appellant.

Stephen J. Briggs, Creath S. Thorne, Morton, Reed & Counts, St. Joseph, for respondent.

Before ULRICH P.J., and LOWENSTEIN and HANNA, JJ.

LOWENSTEIN, Judge.

This is an appeal from the circuit court's denying damages in an inverse condemnation action. A trustee for the Christopher Harris Trust (Trust), brought this suit when the defendant, The Missouri Department of Conservation (Department), prohibited commercial fishing on a lake located on Trust's property. At the heart of the case is the effect of enforcement of a regulation which prohibits commercial fishing on what is denominated as a waterway of the state.[1] As will be discussed *infra,* "commercial fishing" of a state waterway is generally prohibited by Missouri's conservation laws. Appellant–Trust, sought a declaration that King Lake, being solely on Trust's property, was not a "water of the state," and it could have the fish from that lake commercially harvested. The trial court held against the Trust, disagreeing with the Trust's theory that the effect of the enforcement of the Department's regulation was a taking and entitled Trust to damages.[2]

Many of the facts here were set out in the opinion following the earlier grant, by a different judge, of a motion dismissing the petition. In *Harris v. Missouri Department of Conservation,* 755 S.W.2d 726 (Mo.App.1988), this court reversed and remanded, ordering a trial to determine whether Department's actions showed some valid governmental purpose or interest. *Id.* at 731. This appeal follows the trial.

The property in question is King Lake, a lake of 230 acres in size, located primarily within DeKalb County, with its basin extending into Gentry County. King Lake was created in 1969 by the damming of Lost Creek, a small stream flowing through Gentry and DeKalb Counties. The lake is a

---

1. As set out in Footnote 3, and as pertinent here, "waters of the state" include streams which are subject to the movement of fish to and from other waters of the state, and waters of the state do not include bodies of water completely confined on a landowner's property.

2. The Department's authority to act as a state agency is set out on pgs. 728–29 of *Harris v. Missouri Department of Conservation, supra.*

   **Missouri Const. Art. IV § 40(a).** "The Commission may acquire by purchase, gift, eminent domain, or otherwise, all property necessary, useful or convenient for its purpose...." Mo. Const. Art. IV, § 41. Missouri statutes create a department of conservation to be headed by the conservation commission. § 252.002.1, R.S.Mo.1986. All powers, duties and functions of the conservation commission have been transferred to the department of conservation. § 252.002.2.

   In the same chapter, ownership and title to all wildlife of and within the state is declared to be in the State of Missouri. **§ 252.030.** A person who fails to comply with or violates this law or any such rules and regulations does not acquire any title, ownership or possessory right in wildlife, and any person pursuing, taking, killing, possessing or disposing of wildlife is deemed to consent that title to the wildlife remains in the State of Missouri for purposes of control, management, restoration, conservation and regulation. *Id.* No wildlife shall be pursued, taken, killed, possessed or disposed of except in the manner, to the extent and at the time or times permitted by the rules and regulations. **§ 252.040.** Wildlife includes fish. **§ 252.020(3).**

conservation lake designed to control soil erosion. Lost Creek originates about two miles above, and flows into King Lake. The creek continues below King Lake, being fed by overflow from a spillway at the dam between the creek and the lake, and eventually reaches the Grand which flows into the Missouri River. The actual basin of King Lake at normal pool extends into Gentry County. At maximum flood pool, King Lake grows to 448 acres and will encroach on the property of many other landowners. Lost Creek and nearby Willow Creek are intermittent streams which sustain fish populations. Prior to and during the time Trust owned King Lake, fish did move from Lost Creek to King Lake and then back to Lost Creek. King Lake, Inc. developed the lake in 1969. Trust purchased it in early 1980 for $621,000.

When Trust purchased King Lake, the trustee contemplated various economic uses for the property, including a possible golf course, housing development, and electric generation. Although no formal plats or development plans were made, Trust acknowledges having several discussions with various developers about possible development of the land. Trust also used King Lake as a source of irrigation for the surrounding crop land. Before Trust purchased King Lake, there was no commercial fishing of King Lake. During the first year of ownership of King Lake, Trust did not commercially fish or develop plans to commercially fish the lake. This was the case for the first several years of Trust's ownership of King Lake. It was not until May or June of 1983, when Trust had a conversation with commercial fisherman, Jackie Shields, that arrangements were made to commercially fish the lake.

Also, in May or June of 1983, Department reported to Trust that there could be **no** commercial fishing of King Lake. Department mailed Trust a copy of the Wildlife Code containing the "waters of the state" definition. Nevertheless, Trust continued commercially fishing King Lake. A routine investigation of King Lake by Department revealed that commercial fishing was indeed taking place, and commercial fisherman Jackie Shields admitted to the fishing.

Shields was fined $300.00 for commercially fishing King Lake.

In 1984, Trust requested Department purchase King Lake from it. Department did purchase the lake at a price of $750,000. Department did not stock the lake prior to its purchase in 1984. There is, and was, habitat for fish both above and below King Lake in Lost Creek.

After the purchase of King Lake by Department, Trust filed suit against Department in 1986, claiming inverse condemnation. The thrust of the suit is that Department's arbitrary rulings forced Trust to lose money and not meet its payments on the deed of trust for the land; thus, forcing Trust to sell (albeit at a profit), which amounted to a forced taking without proper compensation. *Harris v. Department*, 755 S.W.2d at 727. Because of the court's ruling on the question of whether King Lake is a "water of the state," the question of the ability of a former landowner to sell land to the state at a profit is not further addressed.

### Points on Appeal

Trust presents a total of five points on appeal. They are as follows: 1) King Lake was totally enclosed in single ownership by Trust; thus, Department had no right to prohibit commercial fishing of the lake; 2) Department had no power to promulgate a regulation involving waters "subject to the movement of fishes," because such a regulation is unconstitutionally vague and there was no evidence of movement of fishes in King Lake; 3) Department's ban against commercial fishing serves no legitimate public interest; 4) The ban constituted a Fifth Amendment "taking," because it denies Trust all commercial use of King Lake property; and 5) As a result of the "taking," Trust is entitled to monetary damages from Department.

### Standard of Review

Trust challenges the findings of the trial court made in the course of rendering its judgment. Therefore, review will be under the abuse of discretion standard. The trial court's judgment may only be reversed if "there is no substantial evidence to support

it, if the decision is against the weight of the evidence, or if the judgment erroneously declares or misapplies the law." *Swall v. Custom Automotive Services, Inc.,* 831 S.W.2d 237, 239 (Mo.App.1992) citing *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo.1976).

### Property Enclosure/Single Ownership

■ Trust's first point on appeal states that because King Lake was totally enclosed in single ownership, Department had no right to prohibit commercial fishing in the lake. Trust claims this is because a totally enclosed lake can't be "waters of the state." [3]

■ As stated in *Harris v. Department,* 755 S.W.2d at 729, the definition of "waters of the state" **excludes** certain waters which are entirely confined and located completely upon land owned or leased by a single person. Such is not the case here. The record supports the trial court's finding that King Lake was **not** entirely confined to one area of ownership. The lake boundaries extend into a neighboring county, and at full flood pool, King Lake extends onto several parcels of land owned by others in Gentry County. Therefore, King Lake falls squarely subject to the Department's rules and regulations concerning "waters of the state," bodies of water, thus falling under the jurisdiction of Department. In addition, even if Trust were able to prove single ownership or total enclosure of King Lake, the lake would still be a "water of the state" under **3 C.S.R. 10-11.805(39)** because it is subject to the movement of fishes, as discussed in the next point.

The point is denied.

### Constitutionality of Regulation

Under this point, Trust attacks the regulation in question, *supra n. 3,* over the language at the end which designates as a water of the state any "waters ... which are subject to movement of fishes to and from waters of the state." This language would make King Lake a water of the state, even if it were on land under single ownership. Even though the court has already affirmed the trial court's ruling on the single ownership issue, the Trust's second point will be examined.

1) The first argument is the "movement of fishes" language went beyond the rule-making authority of Department, since the legislature has already defined "waters of the state" in § **644.016(15), R.S.Mo. Cum.Supp. 1993.** (This statute, part of the Clean Water Law dealing with water pollution under Chapter 644, does not add anything to the definition about movement of fishes.)

■ Under § **252.030,** *supra,* Department is granted rule-making authority over fish under the Wildlife Code. That a different statutory definition is described in the Water Pollution chapter does not limit Department's regulation making authority. *Missouri Hospital Association v. Missouri Department of Conservation Affairs, Regulation and Licensing,* 731 S.W.2d 262, 264 (Mo.App.1987).

■ 2) Even if there was authority to promulgate the rule, Trust alleges the rule is still unconstitutionally vague.

Trust points to *Dallen v. Kansas City,* 822 S.W.2d 429, 435 (Mo.App.1991) as holding persons of common intelligence would not be able to look at King Lake and realize that it is a "water of the state."

In *Reid v. Ross,* 46 S.W.2d 567 (Mo.1932), the Supreme Court of Missouri adjudicated the constitutionality of what was the precursor to the current "water of the state" regulation. In *Reid,* the landowner owned a large lake which was connected to the Missouri River by only a thin drainage ditch. The lake and the river were only connected 12 days per year but when they were connected, fish could pass between the two. The Supreme Court determined the "waters

---

**3.** 3 C.S.R. 10–11.805(39) states as follows:
**WATERS OF THE STATE:** All · rivers, streams, lakes and other bodies of surface water lying within or forming a part of the boundaries of the state which are not entirely confined and located completely upon lands owned or leased by a single person or by two or more persons jointly or as tenants in common and including waters of the United States lying within the state. Waters of the state will include any waters which have been stocked by the state or which are subject to movement of fishes to and from waters of the state.

of the state" regulation was clear and not unconstitutionally vague and that the fish coming from the privately owned lake were subject to the state's regulation.

*Reid* is very closely akin to the situation at bar. There is ample evidence on record that fish move from King Lake to Lost Creek and vice versa. There is also ample evidence that King Lake and Lost Creek are connected bodies of water at least a few days per year. The fish in King Lake are fish that came from other bodies of water. Furthermore, the evidence at trial demonstrated at the time the Trust purchased King Lake: (a) the trustee knew that the lake contained wild fish; (b) King Lake was connected a significant portion of the year to Lost Creek and Willow Creek above King Lake; (c) fish commonly move about within connected bodies of water; (d) overflows regularly occurred out of King Lake into Lost Creek downstream and that fish escaped from King Lake into Lost Creek; and (e) Lost Creek and Willow Creek were totally typical northwest Missouri streams, sustaining within them typical wild fish species observed and abundant throughout the watershed in similarly situated streams. And, as in *Reid,* the trial court in this case concluded that Trust had constructive notice of the regulation, and had all the information necessary to determine whether King Lake was affected by the regulation at issue. In addition, the trial court concluded a person of ordinary intelligence could read the ordinance and understand what conditions must be met in order for a body of water to be considered "waters of the state" and if King Lake qualified as a "water of the state."

■ 3) Trust finally claims the trial court erred in finding that King Lake was "subject to the movement of fishes" from Lost and Willow Creeks.

■ In reviewing evidence, the factual findings of the trial court are to be accorded great deference and are to be upheld if there is any evidence to support them. *Swall v. Custom Automotive Services, Inc.,* 831 S.W.2d 237, 239 (Mo.App.1992). In reviewing the factual findings as reported in the trial court's ruling, the following evidence exists: 1) prior to and during the time Trust owned King Lake, fish could and did move to and from King Lake into Lost Creek above King Lake, and out of King Lake into Lost Creek; and 2) the fish found in King Lake during the time it was owned by Trust were native fish which originated in Lost Creek. The evidence lends itself to the conclusion that King Lake is subject to the movement of fishes.

The point is denied.

### Regulation Protects Legitimate State Interest

■ The third point asserts the "waters of the state" regulation serves no legitimate state interest and, as such, is void. Trust claims Department cannot sustain an argument that a ban on commercial fishing is justified in order to prevent loss of existing fish in King Lake.

■ Trust relies on *Agins v. City of Tiberon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) which sets forth the conditions under which a "taking of property may occur." Under *Agins,* the ordinance or regulation in question can be found to effect a taking if it does not substantially advance legitimate state interests. *Id.* at 260, 100 S.Ct. at 2141. Regulations are a valid exercise of state power and are constitutional unless clearly arbitrary and unreasonable, meaning they have no substantial relation to public health, safety, morals or general welfare. *Agins,* 447 U.S. at 260, 100 S.Ct. at 2141, citing *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). *Agins* goes on to hold that the test essentially involves a weighing of public and private interests. *Id.* 447 U.S. at 260, 100 S.Ct. at 2141.

The trial court applied the facts ascertained at trial to the standards of *Agins* and made specific findings in regards to the interests furthered by the regulation. These specific factual findings are to be accorded due deference by this court and will be upheld absent an abuse of discretion. *Swall,* 831 S.W.2d at 239.

The trial court found several state interests were served by the regulation. They are as follows:

1. The court finds and concludes that the evidence adduced by the Department of Conservation at trial demonstrated that the public's interest in the control, management, conservation and regulation of fish and wildlife is advanced and furthered by the rules and regulations issued by the Department, . . . .

2. The court finds and concludes that the "waters of the state" regulation makes clear the Department's jurisdiction over those bodies of water comprising as a whole the hydrologic system of the State of Missouri and in which the fish of Missouri are to be found. Substantial interests of the State of Missouri are served by the application of the "waters of the state" regulation to situations where there is movement of fishes to and from "waters of the state" including: (i) enforcement of the state's rights in fish titled in the state, (ii) prevention of spread of disease in fish populations, (iii) prevention of the spread and resulting proliferation of exotic species of fish in the hydrologic system managed by the state of Missouri, and (iv) maintenance of proper fish populations throughout the connected waterways.

3. The court concludes that the "waters of the state" regulation reasonably promotes the objectives of the regulatory scheme of the Department of Conservation and the "water of the state" regulation in particular. Missouri has specifically upheld and found constitutional fishing laws which classify territory, permitting fishing on one stream or in one territorial area and denying it in others. *State v. Terrell*, 303 S.W.2d 26 (Mo. 1957). Such classification is permissible if the court finds and concludes that reasonable grounds exist for such classifications, and this court does so conclude. The regulation reasonably includes bodies of water which are not entirely confined and located completely upon lands owned by a single person, and also reasonably includes waters which have been stocked by the state or which are subject to movement of fishes to and from other waters of the state. This court finds and concludes that it is reasonable that bodies of water so defined, should be subject to regulation by the Missouri Department of Conservation.

In addition, the trial court also found that the regulation advanced the following legitimate state interests as applied to King Lake:

1. The court finds that Lost Creek and Willow Creek above King Lake sustained native fish populations and that such fish populations were the source of the fish to be found in King Lake during the time it was owned by the Harris Trust. The court further finds that the fish populations of King Lake move freely into Lost Creek and Willow Creek and that fish populations routinely moved out of King Lake downstream. The court concludes that the fish in King Lake, at the time the Harris Trust owned it, were wild fish titled in the state of Missouri, that such fish were not confined to King Lake, that legitimate state interest existed and exists in controlling, managing, conserving and regulating those fish, and that the "waters of the state" regulation further advances those state interests.

Giving due deference to the trial court's factual findings, it is now proper to conduct an *Agins* balancing test. According to the evidence on the record, the public interest served here is the "control, management, restoration, conservation and regulation of the . . . fish . . . and wildlife resources of the state." **Art. IV, §§ 40–46 of the Missouri Constitution** mandates such public interests be met and advanced.

There was a valid state interest shown here in not allowing commercial fishing on King Lake. The public interest is served by protecting the number of fish harvested in King Lake. "A land use regulation reasonably related to promotion of the general welfare will not be deemed a 'taking' just because there has been a diminution of property value." *Penn. Central v. City of New York*, 438 U.S. 104, 133, 98 S.Ct. 2646, 2663,

57 L.Ed.2d 631 (1978). Under these circumstances, there can be no conclusion of a compensable taking. *Nollan v. California Coastal Commission*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).

The point is denied.

### Use of Regulation Not a "Taking"

Trust's final contention is that a "taking," entitling Trust to damages, occurred when Department banned commercial fishing in King Lake because the application of the regulation denies Trust **all** commercial use of King Lake.

Because it has already been held that the state regulation in question here advances legitimate state interest, under the United States Supreme Court ruling in *Keystone Bituminous Coal Association v. De Benedictis*, 480 U.S. 470, 492, 107 S.Ct. 1232, 1245, 94 L.Ed.2d 472 (1987), where the regulation advances legitimate state interests, ... no "taking" has occurred. And because no "taking" has occurred, no recovery is permitted under the Fifth Amendment's "taking" clause.

Nevertheless, even if Trust wanted to prove all commercial use was denied by the regulation, the burden of proof is heavy on Trust to prove **all** economic use was denied. *Penn Central* at 130–31. This Trust cannot do. Basically, the rule is as follows: where a landowner has a full "bundle" of property, the loss of one "strand" of the bundle is not a "taking" because a majority of the property remains. *Andrus v. Allard*, 444 U.S. 51, 65–66, 100 S.Ct. 318, 326–27, 62 L.Ed.2d 210 (1979).

Trust was not denied all economic use of the property, as there was evidence the commercial fishing use was only a small portion of the use of the property.

The denial of the commercial fishing on King Lake was **not** the denial of all economic use of Trust's property, meeting the standards of *Keystone* and *Andrus*, respectively. Thus, there was no compensable "taking."

Because this court held no "taking" occurred under the Fifth Amendment, no damages are due Trust.

The point is denied.

The judgment is affirmed.

All concur.