**JERRY BENNETT MASONRY, INC., Appellant,**

v.

**CROSSLAND CONSTRUCTION CO., INC., and Fireman's Insurance Company of Newark, New Jersey, Respondents.**

No. 26456.

Missouri Court of Appeals, Southern District, Division Two.

July 28, 2005.

Motion for Rehearing or Transfer Denied Aug. 22, 2005.

Application for Transfer Denied Sept. 20, 2005.

Steven E. Marsh, Hulston, Jones & Marsh, Springfield, for appellant.

Jason J. Higdon, Spencer, Scott & Dwyer, P.C., Atty., Joplin, for Resp. Crossland Const. Co., Joplin.

Robert A. Babcock, Baker, Sterchi, Cowden & Rice, LLC, Jefferson City, Atty., for Respondent Firemen's Ins. Co.

ROBERT S. BARNEY, Judge.

This appeal arises from a dispute relating to a subcontract agreement for masonry work entered into between Appellant Jerry Bennett Masonry Contractor, Inc., ("Subcontractor") and Respondent Crossland Construction Co., Inc., ("Contractor"), in connection with the construction of a school building ("the project") for Webb City R–7 School District ("the District") in Jasper County, Missouri.[1] Contractor was the primary contractor for the project.[2]

The genesis of the present dispute arose from Contractor's 10% "retainage" of $67,057.50, which was otherwise due Subcontractor upon completion of Subcontractor's portion of the project under the terms of the parties' contract. Contractor asserted it was necessary to retain the $67,057.50 because Subcontractor maintained an insufficient number of masonry personnel at the project site which caused delays in completing the project and necessitated extra work by Contractor in order to prevent its being assessed liquidated damages under its contract with the District.[3]

Subcontractor countered that any delays were caused by weather, soil conditions at the site, other subcontractors, such as roofing and electrical subcontractors, and Contractor's own errors. Additionally, Subcontractor maintained it completed its work by December 16, 1998, in compliance with the third schedule agreed upon by Contractor and Subcontractor the previous month.

Subcontractor ultimately brought a third amended petition in five counts against Contractor and Firemen's. In Count I, Subcontractor sought judgment under section 34.057, the Prompt Payment Act (sometimes referred to as the "Missouri Public Works Prompt Payment Act"), and under section 431.180 (sometimes referred to as the "Private Prompt Payment Act") for the $67,057.50 "retainage" withheld by Contractor together with attorney's fees and interest at the rate of 18% per annum, and "other and further relief as the Court may deem just and proper;" Counts II and III were alternative claims against Contractor in the amount of $67,057.50, together with a request for such attorney's fees and interest allowed by contract or law; Count IV sought payment from Firemen's in the amount of $67,057.50 per the terms of the payment and performance bond, and requested attorney's fees and interest allowed by contract or law; and, Count V sought damages in the amount of $67,057.50 due to Firemen's unreasonable and vexatious refusal to pay the amount of $67,057.50 per the terms of the performance and payment bond, together with "pre-judgment interest ... interest, penalties and attorney's fees ... pursuant to [s]ection 375.296 ... and/or [s]ection

1. Respondent Firemen's Insurance Company of Newark, New Jersey ("Firemen's"), as surety, furnished a payment and performance bond on behalf of Contractor, its principal. See § 107.170. All statutory references are to RSMo 2000 and all rule references are to Missouri Court Rules (2004).

2. The prime contract between the District and Contractor, dated January 13, 1998, was for the amount of $3,534,000.00.
The subcontract agreement between Contractor and Subcontractor originally called for a payment to Subcontractor in the amount of $653,000.00, upon completion and acceptance of the terms of the subcontract; however, additional monies became due resulting from a "change order" to the subcontract.

3. The prime contract between the District and Contractor called for periodic progress payments during the course of the three-hundred-day-project as well as a 10% "retainage" provision, similar to that of the subcontract between Contractor and Subcontractor; however, the projected time schedule of three hundred days was not met.

375.420...." Contractor counterclaimed, seeking damages in the total amount of $171,140.00, alleging Subcontractor breached the subcontract due to inordinate delays in completing its masonry work.

In its judgment, the trial court found both Contractor and Subcontractor at fault due to "poor management decisions ... regarding manpower staffing" and "inadequate planning during some phases of the project." It awarded Subcontractor damages against Contractor on Count I of its third amended petition in the amount of $67,057.50, due to Contractor's "mistakes in planning on the project;" but determined Contractor was entitled to a set-off, per its counterclaim, in the amount of $33,496.00, as a result of Subcontractor's "failure to adequately provide manpower for the timely completion of the project."

Additionally, the trial court found in favor of Firemen's on Subcontractor's claim for vexatious refusal to pay, and sustained Firemen's request for a partial summary judgment on Subcontractor's claim for vexatious refusal to pay. It also granted judgment in favor of Subcontractor against Firemen's on Count V of its claim for payment under the performance bond but only "to the extent that [Contractor] is unable to satisfy this judgment." Neither Contractor nor Firemen's appeals.

Subcontractor now brings nine points on appeal, discussed below. We affirm in part and reverse and remand in part.

The standard of review in a court-tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The court of appeals will affirm the judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* Although the reviewing court defers to the trial court's findings of fact, the court does not defer to the trial court's determinations of law. *City of*

*Kansas City v. Hon,* 972 S.W.2d 407, 409 (Mo.App.1998). " 'Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case.' " *Kenney v. Wal–Mart Stores, Inc.,* 100 S.W.3d 809, 814 (Mo. banc 2003) (citation omitted). The weight of the evidence is determined by its effect in inducing belief. *White River Dev. Co. v. Meco Sys., Inc.,* 806 S.W.2d 735, 737 (Mo.App.1991). A judgment should be set aside as being against the weight of the evidence only with caution and with a firm belief that the judgment is wrong. *Id.*

Rule 73.01(c) provides that "[a]ll fact issues on which no specific findings are made shall be considered as having been found in accordance with the result reached." "In reviewing evidence, the factual findings of the trial court are to be accorded great deference and are to be upheld if there is any evidence to support them." *Harris v. Mo. Dep't of Conservation,* 895 S.W.2d 66, 71 (Mo.App.1995). "The admissibility of evidence lies within the sound discretion of the trial court and will not be disturbed absent abuse of discretion." *Nelson v. Waxman,* 9 S.W.3d 601, 603 (Mo. banc 2000).

In its first point, Subcontractor maintains the trial court erred in failing to assess 18% interest pursuant to section 34.057.1(7) or, alternatively, 9% interest pursuant to section 408.020, on the amount of damages awarded Subcontractor. Subcontractor argues the trial court awarded it damages in the amount of $67,057.50 under Count I of its third amended petition; accordingly, since there was no question or dispute about the amount of $67,057.50 owed Subcontractor under its subcontract with Contractor—being a 10% retainage amount—this sum of money constituted a "liquidated" amount to which the

foregoing, alternative rates of interest applied.

Contractor asserts, however, that in its award the trial court entered judgment in favor of Subcontractor under Count I of Subcontractor's claim, being a claim under the Missouri Public Prompt Payment Act, yet made no award of interest. Contractor contends the trial court implicitly determined that Contractor had not withheld the retainage amount in bad faith and without reasonable cause, a prerequisite to an entitlement of 18% interest under section 34.057.1(7).[4] Contractor also argues that Subcontractor's exclusive claim under the Prompt Payment Act negated a claim of interest by Subcontractor under the provisions of section 408.020.[5]

■ We initially note that the "Prompt Pay[ment] Act promotes timely payment of contractors, subcontractors, and suppliers on contracts with public owners for public works construction projects." *Leo Journagan Constr. Co. v. City Utils.*, 116 S.W.3d 711, 724 (Mo.App.2003). "This law requires public owners and contractors to make prompt payments and limits amounts withheld as retainage." *Envtl. Prot., Inspection, Consulting, Inc. v. City of Kansas City*, 37 S.W.3d 360, 369 (Mo.App.2000). "The Prompt Pay[ment] Act is considered a remedial statute and therefore requires liberal interpretation." *Journagan*, 116 S.W.3d at 725. "The threshold requirements of the act are the payment due dates, which are the events that trigger the remedies available for untimely payment." *Id.*

For our current purposes, it will be sufficient to note that the statute requires a contractor to pay the subcontractors and material suppliers within fifteen days after the contractor receives payment from the public owner. If the contractor does not make such payment in full within fifteen days after receipt of its payment, and if such payment is withheld without reasonable cause, the contractor shall be liable not only for the amount of the due payment, but also for penalty interest in the amount of one and one-half percent per month.

*City of Independence for Use of Briggs v. Kerr Const. Paving Co., Inc.*, 957 S.W.2d 315, 320 (Mo.App.1997); *see also* § 34.057.1(7).

■ "The language of [section] 34.057.6 indicates that 'a court of competent jurisdiction' is to decide whether the withholding was done in 'good faith for reasonable cause.'" *Briggs*, 957 S.W.2d at 321 (quoting § 34.057.6). "In any litigation about these provisions, the court may, in its dis-

4. Section 34.057.1(7) provides:

If the contractor, without reasonable cause, fails to make any payment to his subcontractors and material suppliers within fifteen days after receipt of payment under the public construction contract, the contractor shall pay to his subcontractors and material suppliers, in addition to the payment due them, interest in the amount of one and one-half percent per month, calculated from the expiration of the fifteen-day period until fully paid. This subdivision shall also apply to any payments made by subcontractors and material suppliers to their subcontractors and material suppliers and to all payments made to lower tier subcontractors and material suppliers throughout the contracting chain.

5. Section 408.020 provides:

Creditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made; for money recovered for the use of another, and retained without the owner's knowledge of the receipt, and for all other money due or to become due for the forbearance of payment whereof an express promise to pay interest has been made.

cretion, also award attorney's fees to the prevailing party." *Id.* at 320–21. We also note that a bad faith determination is a question of fact to be decided by the trier of facts. *City of Kansas City,* 37 S.W.3d at 371.

■ In the instant matter, the trial court made no express determination in its judgment that Contractor acted in bad faith without reasonable cause in withholding payments from Subcontractor. As discussed in point two below, there was sufficient evidence supporting the trial court's implicit determination that lack of sufficient manpower by Subcontractor contributed to Contractor's delay in completing the project in a timely fashion. Under these circumstances we cannot say that the trial court erred in not awarding prejudgment interest in the amount of 18% pursuant to section 34.057.

■ We determine, however, that the trial court erred by not awarding Subcontractor interest at the rate of 9% pursuant to section 408.020 after Contractor was paid its retainage by the District. As previously related, "[s]ection 408.020 provides that creditors shall receive interest 'for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made.'" *Bolivar Insulation Co. v. R. Logsdon Builders, Inc.,* 929 S.W.2d 232, 236 (Mo.App.1996) (quoting § 408.020). "If parties have not agreed to a rate of interest, 'creditors shall be allowed to receive interest at the rate of nine percent per annum.'" *Id.* "The nine percent statutory rate is applicable only if the parties have no separate agreement with respect to the allowable rate of interest." *Id.* "'[I]n the absence of an agreement to the contrary, interest is not recoverable on an unliquidated demand.'" *Id.* (quoting *Burger v. Wood,* 446 S.W.2d 436, 443 (Mo. App.1969)). Therefore, "'[i]n order to be

liquidated so as to allow interest, the claim must be fixed and determined or readily determinable, but it is sufficient if it is ascertainable by computation.'" *Id.* (quoting *Schnucks Mkts, Inc. v. Cassilly,* 724 S.W.2d 664, 668 (Mo.App.1987)).

> The mere fact that a party denies liability or defends a claim against him, or even the existence of a bona fide dispute as to the amount of the indebtedness, does not preclude recovery of interest; for it is the character of the claim and not of the defense to it that determines whether it is liquidated.

*Twin River Constr. Co. v. Pub. Water Dist.,* 653 S.W.2d 682, 695 (Mo.App.1983) (quoting 47 C.J.S. *Interest and Usury* § 21). "'The existence of an unliquidated set-off or counterclaim against the claim does not necessarily bar interest on the claim.'" *Id.* (quoting *Eastmount Constr. Co. v. Transport Mfg. & Equip. Co.,* 301 F.2d 34, 42–43 (8th Cir.1962)); *see also Killian Constr. Co. v. Tri–City Constr. Co.,* 693 S.W.2d 819, 829 (Mo.App.1985).

Here, as best we discern from our review of a rather voluminous record and, frankly, repetitive and intricate briefs from the parties, Subcontractor completed its work on December 16, 1998, and presented an invoice seeking payment from Contractor under the terms of the subcontract on December 24, 1998. Contractor paid Subcontractor all but the 10% retainage in the amount of $67,057.50. This was a readily ascertainable or computable amount of money comporting with the requirements of section 408.020. *Bolivar,* 929 S.W.2d at 236. The subcontract between Contractor and Subcontractor provided for no interest payments after completion of the project. Therefore, pursuant to section 408.020, Subcontractor was entitled to a rate of interest at 9% per annum.

Lastly, we note that while Subcontractor did not expressly request statutory interest pursuant to the provisions of section 408.020, Subcontractor did pray in its Count I "for such other and further relief as the Court may deem just and proper." "[A]n express allegation seeking prejudgment interest is not a prerequisite to an award of such interest." *Dierker Assocs., D.C., P.C. v. Gillis*, 859 S.W.2d 737, 746 (Mo.App.1993). "A petition which prays that the court grant 'such other relief as may be proper' is sufficient." *Id.* (quoting *Addison v. Jester*, 758 S.W.2d 454, 460 (Mo.App.1988)). Based on the foregoing, Subcontractor's claim and prayer under Count I satisfied the requirement of section 408.020. Accordingly, Subcontractor is entitled to interest at the rate of 9% per annum on the principal amount of $33,561.50 ($67,057.50 minus $33,496.00 as an offset per Contractor's counterclaim) from the date that Contractor was paid Contractor's own retainage by the District. Point One is denied in part and affirmed in part.

Preliminary to taking up Subcontractor's second point, we note the record shows that near the conclusion of the project, the project architect wrote Contractor informing it that while the agreed on and amended date for the project completion—taking into consideration various weather and "additional days for Change Orders, etc."—was January 29, 1999, substantial completion was documented on April 13, 1999. In other words, the project was behind schedule.

In lieu of liquidated damages under the contract, the District ultimately agreed that Contractor construct a road thirty-five feet wide and certain sidewalks at or along the project site. Subcontractor's own expert at trial computed the cost for the additional work provided by Contractor for the District at $33,496.00. As pre-viously related, in its judgment, the trial court allowed Contractor a set-off, on Contractor's counterclaim in the amount of $33,496.00, as a result of the trial court's determination that Subcontractor had failed to adequately provide manpower for the timely completion of its masonry work. Now, in Point Two, Subcontractor maintains the trial court erred in entering judgment for the set-off in favor of Contractor in the amount of $33,496.00. Subcontractor avers there was no substantial evidence supporting Contractor's counterclaim, that the trial court's determination was against the weight of the evidence and that the trial court had erroneously declared and applied the law of contracts, damages and construction delay.

Boiled down to its essentials, Subcontractor argues it met the only schedule agreed upon; the subcontract did not have any specific, particular, or agreed upon manpower requirements nor a completion date; and, the damages awarded were not proximately caused by any delay or manpower or staffing shortage. Further, Subcontractor argues damages were improperly awarded, since the subcontract provided for only liquidated damages, and damages assessed were not the actual damages which Contractor was legally obligated to pay to the District in either event. Additionally, Subcontractor asserts that Contractor failed to comply with and violated the notice and "other requirements of [section] 34.057," thereby waiving or having its claim barred.

We initially note "[a]ppellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy*, 536 S.W.2d at 32. "In reviewing evidence, the factual findings of the trial court are to be accorded great deference and are to be

upheld if there is any evidence to support them." *Harris*, 895 S.W.2d at 71. "On appeal, in considering the sufficiency of the evidence, this [C]ourt accepts as true the evidence and permissible inferences favorable to the judgment and disregards contradictory evidence." *Luna v. Smith*, 861 S.W.2d 775, 780 (Mo.App.1993). "Our concern on review is whether the trial court reached the proper result, not the route by which it reached that result." *Runny Meade Estates, Inc. v. Datapage Techs. Int'l, Inc.*, 926 S.W.2d 167, 170 (Mo.App. 1996). "[C]onflicts in evidence are for the trial court to resolve and we take the facts in accordance with the results there reached." *Gross v. Diehl Specialties Int'l, Inc.*, 870 S.W.2d 246, 248 (Mo.App.1994). "The trial court has the prerogative to make a finding of value within the range of values testified to at trial." *Kickham v. Gardocki*, 966 S.W.2d 361, 362 (Mo.App. 1998). As previously set out, the "credibility of witnesses and the weight to be given their testimony is a matter for the trial court, which is free to believe none, part, or all of their testimony." *Herbert v. Harl*, 757 S.W.2d 585, 587 (Mo. banc 1988).

■ We begin our analysis by noting that the record supports Subcontractor's proposition that it concluded the third schedule in a timely manner in December of 1998, and that the subcontract was silent as to the specific manpower requirements to successfully complete the project. Nevertheless, there exists evidence in the record showing that Subcontractor failed to live up to its obligation under the subcontract to adequately staff the job and add additional manpower at the request of Contractor, thereby creating delays in the months following commencement of work on the project. The record shows that these delays subsequently impacted the ability of other subcontractors to complete their work on the project.

The subcontract in question contained no completion deadline. Instead, Section 2 of the subcontract required subcontractor to "fully cooperate with the Contractor and the [District] to reduce and eliminate, if possible, all delays or hindrances in the orderly progress of the Work." Further, Section 8 provided that if "Subcontractor's progress is inadequate due to conditions within Subcontractor's control, the Contractor may require the Subcontractor to increase or change its labor force, the number of work shifts, the equipment on the job, all without additional cost to Contractor, the [District], or the Architect/Engineer."

Accordingly, Subcontractor was compelled pursuant to the terms of the subcontract to perform the work in accordance with Contractor's schedule on what Subcontractor's own expert, Robert Scott ("Scott"), admitted was a "masonry intense" project. Scott also acknowledged that "a good portion of the project depends on the efforts and quality of work of the mason."

On July 16, 1988, Contractor's Vice President, Curt Crossland ("Crossland"), wrote Ken Taylor ("Taylor"), Subcontractor's estimator (for purposes of materials and bricklayers), regarding the slowness of progress on the project and the District's concerns with the "current progress" of the project. Crossland reminded Taylor that Subcontractor was required to be "complete with the masonry block interior and exterior walls on September 3 [1998] and the brick to be complete four weeks after that."

Another letter was sent to Taylor on August 17, 1998, by Crossland, relating that the September 3, 1998, deadline for the completion of the "exterior and interior block walls" would not be met, and that Subcontractor would be two weeks late. This was followed by an additional letter

dated September 29, 1998, signed by Matthew Knight ("Knight"), the project engineer, complaining that the "brick would not be complete until early December." The letter related that "[t]his is unacceptable and is over two months past your completion date on our schedule." Furthermore, the letter set out that Contractor's agents had "talked to you about manpower from day one, the [District] has been questioning your manpower, and it seems as though we are not very high on your priority list." It was reiterated that "[i]f you continue at the current pace, the [District] will most likely access liquidated damages to [Contractor] because it will be impossible to finish a 70,000 [square foot] school by the 15th of January if the masonry is not complete until December." Knight then warned Taylor that "should these damages be levied on us, we will access liquidated damages and/or schedule delay damages per Section 2 and 8 of our Subcontract Agreement."

At this point in the discussion, it should be noted that the record reveals while Subcontractor was working on the District's project, it also had "[e]ight or ten" other projects it was working and that its "80 to 120" bricklayers and laborers were fully employed on these various projects. Indeed, the record reveals there was a shortage of masons to complete the various, other projects in the area. Scott, Subcontractor's expert, testified that "all craftsmen were fully employed . . ." and there were a "very limited number of masons available. They were all fully employed." He acknowledged "without a doubt" that "it would be tough to find additional masons."

Then, in a letter to Taylor dated November 11, 1998, project engineer Knight complained that he had visited the project site "yesterday" and Subcontractor had only "5 brick layers working today on the west side of the building." Knight complained that the December 1, 1988, completion date would not be achieved "with the current manpower on the project." The project engineer reiterated he had written two previous letters discussing the schedule delay by Subcontractor, but that Contractor had had "little or no response to these letters and this has become very frustrating." He related that "[w]e are not the only people that have noticed your lack of manpower, even the [District] has written a letter that I attached to my July 16 letter."

Knight also wrote:

[i]t is hard to believe how anybody bid a $653,000 block and brick job and planned to only have 6 to 8 masons on the job and get it done in 4 months as the original schedule shows. Not one time have I heard you state that the schedule could not be meet [sic] when it was original [sic] produced and updated.

Knight then related that if Subcontractor did not "supplement [its] current manpower within 3 days we will be forced to do so for you."

As best we discern from our review of the record, in apparent response to Knight's letter, and for the first time in the course of completion of its portion of the project, Subcontractor's agent, Taylor, expressed concerns about deficiencies on the part of other subcontractors working on the project. Significantly, Taylor acknowledged Subcontractor had manpower problems. He wrote: *"[g]ranted we have had a manpower problem . . . ."* [6] (Emphasis added).

---

6. Knight also testified that in the course of construction there existed certain roofing and electrical problems, he related that "[t]here weren't any problems as far as the installation of [the roof]. It proceeded essentially as soon as the areas were ready to roof." Knight

Furthermore, the record supports the proposition that in order for Contractor to limit the delay caused by Subcontractor's paucity of manpower during the earlier months of the project, Contractor, in November of 1998 "had to crash the schedule" by bringing all subcontractors on site in rapid succession.

Lastly, we note that the project architect, James Latimer, acknowledged in his testimony that "masonry takes up a larger proportion of the ultimate work on this— on a project like this than it will on other types of structures," and also set out that "[w]e didn't feel that the project was adequately staffed."

Considering the foregoing, we cannot say there was a lack of probative evidence supporting the trial court's determination that Subcontractor "fail[ed] to adequately provide manpower for the timely completion of the project."

 Accordingly, we now turn to the remaining portion of the point, being an analysis of Subcontractor's complaints relating to the assessment of damages against it. We are cognizant, of course, of case law that sets out that " 'liquidated and actual damages generally may not be awarded as compensation for the same injury.' " *Trapp v. Barley,* 897 S.W.2d 159, 165 (Mo.App.1995) (quoting *Warstler v.*

*Cibrian,* 859 S.W.2d 162, 165 (Mo.App. 1993)). We also note that this "rule of law has developed in order to protect against the wrong of duplicating damages." *Id.* at 165–66.

Here, the subcontract under review provided for not only liquidated damages but also actual damages.[7] *See Twin River Constr.,* 653 S.W.2d at 694. In its petition, Contractor had sought liquidated damages from Subcontractor for eighty-six days delay to the completion of the project, together with additional damages all totaling $171,140.00. As previously set out, the trial court awarded Contractor $33,496.00 on its counterclaim, as a result of Subcontractor's "failure to adequately provide manpower for the timely completion of the project." This sum of money matched the amount that Subcontractor's expert witness had reasonably calculated the road and sidewalks should have cost Contractor.

 The record reveals that the road and sidewalk construction by Contractor was undertaken as a compromise in settling its dispute with the District for Contractor's delay in timely completing the project. We discern this additional work was performed in lieu of liquidated damages that would otherwise have been assessable by the District against Contrac-

---

further testified that in his opinion "there wasn't a delay" attributable to the lack of electricity on the project. He stated that while he had been "out there a time or two when—you know, when a breaker would trip and they'd have to go re-flip the breaker," he also said that "there wasn't a delay. There was never a day when there wasn't electricians working doing what they needed to do."

7. In addition to the liquidated damage provision of $1,500.00 per day, for failure to "complete the work or deliver his materials within the time agreed upon," as found in Section 2 of the subcontract, we note that Section 8 of the subcontract also provided, in part, that:

All damages, expenses or L.D. losses, including attorney fees or other legal costs which are sustained by the Contractor due to Subcontractor's failure to diligently prosecute the Work and/or failure to complete the Subcontract in a timely manner shall be paid by the Subcontractor to the Contractor. If Contractor incurs or may incur damage, expense or loss due to such failure(s) on the part of the Subcontractor, the Contractor may deduct such amount from any payment or retainage payable to the Subcontractor and/or withhold payment of any funds otherwise owing to the Subcontractor until the situation is remedied or adjusted to Contractor's satisfaction.

tor, under the terms of the project contract. "It is proper for a prime contractor to 'pass on' to a subcontractor liquidated damages caused by the subcontractor." *Taos Constr. Co. v. Penzel Constr. Co.*, 750 S.W.2d 522, 527 (Mo.App.1988). It is our view that the trial court did not award duplicative damages to Subcontractor. "[A] trial court in a case tried without a jury has the prerogative to make a finding of value within the range of values testified to at trial on the issues of damages." *Francis v. Richardson*, 978 S.W.2d 70, 74 (Mo.App.1998). Viewing the evidence in a light most favorable to the holding of the trial court, as we must, we cannot say that the trial court erred in entering judgment in favor of Contractor on its counterclaim in the amount of $33,496.00.[8]

█ In its third point on appeal, Subcontractor maintains the trial court erred in failing to hold that the allegations of its third amended petition were admitted pursuant to Rule 55.09,[9] and in failing to enter judgment under the Prompt Payment Act in its favor, because Contractor failed to file a responsive pleading or affirmative defenses to Subcontractor's amended third party petition. This contention is disposed of against Subcontractor by the ruling in *Blaise v. Ratliff*, 672 S.W.2d 683, 688 (Mo. App.1984).

In *Blaise*, plaintiff sought to rescind a contract for sale of a farm, including the cancellation of two deeds of trust from purchasers to a bank, as well as other equitable relief. *Id.* at 685. The bank filed no answer but did file a counterclaim. *Id.* Accordingly, trial commenced on plaintiff's amended petition with no answer having been filed by the bank. *Id.* at 687–88. On appeal, plaintiff complained the bank could "not deny fraud or rely on its bona fide purchaser status because it did not seek leave to file its answer until all of his evidence was in and rested his case." *Id.* at 687–88. The Eastern District of this Court held that plaintiff "proceeded to trial without objecting to the failure of the Bank to file its Answer, without moving

---

**8.** In its final application, dated September 16, 1999, Contractor certified to the District that all its subcontractors had been paid from funds previously applied for and received by Contractor, despite the fact that Contractor had retained the sum of $67,057.50 from Subcontractor. This procedure was contrary to the provision of section 34.057.2, which, in pertinent part sets out that "[a]mounts intended to be withheld shall not be included in such applications or certifications to the public owner or contractor." We do not approve of the practice of a contractor withholding funds from a subcontractor without noting the withholding in its application or certification to the public owner as the statute requires. Section 34.057.6 provides for an imposition of interest at the rate of one and one-half percent per month together with attorney fees for monies withheld in bad faith or without reasonable cause.

However, we agree with Contractor that while the Prompt Payment Act may include a procedure for handling funds until a dispute has been resolved, it contains no express provisions for the actual resolution of the dispute. Indeed, section 34.057.3 provides that "[d]isputes shall be resolved in accordance with the terms of the contract documents." Here, despite the lack of notice to the public owner, there is nothing in our review of the Prompt Payment Act that precluded Contractor from asserting a right of set-off against any withheld funds in any subsequent civil litigation arising from a genuine dispute among Contractor and Subcontractor. We determine there existed a genuine dispute among the parties. Accordingly, the trial court did not err as a matter of law in authorizing a set-off against the amount of $67,057.50 otherwise owed to Subcontractor.

**9.** Rule 55.09 provides that:

Specific averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleadings. Specific averments in a pleading to which no responsive pleading is required shall be taken as denied.

that it be required to do so, and without taking a default." *Blaise,* 672 S.W.2d at 688. As a result, the court held that plaintiff "waived the mandatory filing of an Answer and his complaint is without merit." *Id.*

Here, Subcontractor went to trial and virtually the entire evidentiary portion of the trial had been completed before mention was made of Subcontractor's third amended petition. The record shows the trial court then "permitted the filing of the [responsive] pleadings and that the defendants deny the allegations and we'll go to trial here on the merits." Significantly, as in *Blaise,* Subcontractor went to trial without answers to its third amended petition being filed; without objections to the failure of Contractor and Firemen's filing respective answers; and, without any request to the trial court by Subcontractor to default Contractor and/or Firemen's for their respective failure to comply with the provisions of Rule 55.09. Under these circumstances Subcontractor waived the mandatory filing of responsive pleadings and answers by Contractor and Firemen's. *Blaise,* 672 S.W.2d at 688. Point denied.

■■■ In Point Four, Subcontractor reiterates the same contentions and arguments as outlined and discussed in Points One and Two relating to the trial court's failure to award 18% interest against Contractor for its purported bad faith withholding of funds without notice to the District, and in asserting frivolous, inflated and pretextual damages. All of these issues have been previously discussed. Point denied.

In Point Five, Subcontractor maintains: The trial court erred in failing to award a monetary judgment in favor of Subcontractor and against Firemen's, (rather than just a contingent obligation) because said judgment erroneously declared and applied the law of

principal and surety in that *inter alia* the liability of Firemen's to [Subcontractor], as surety of [Contractor] was co-extensive to that of [Contractor] and the trial court, in fact, entered judgment against [Contractor].

In its judgment, the trial court granted Subcontractor judgment against Firemen's on Count V of its third amended petition, "to the extent that [Contractor] is unable to satisfy this judgment." Subcontractor maintains this portion of the judgment "basically amounted to only a 'contingent' judgment against Firemen's."

■■■ *City of Independence for Use of Briggs v. Kerr Constr. Paving Co., Inc.,* teaches that "as a general rule, a surety's liability for contract damages is coextensive with that of the principal." *Briggs,* 957 S.W.2d at 319. There is a caveat, however, in that *"[i]n the absence of an agreement to the contrary,* the rights and liabilities of a surety are measured by those of the principal." *Id.* (emphasis added). Here, the payment and performance bond issued by Firemen's provides in paragraph 3 that

> With respect to Claimants, this obligation shall be null and void if the contractor promptly makes payment directly or indirectly, for all sums due.

"The surety is not to be held beyond the terms of his contract; he is bound by his agreement and nothing more." *State ex rel. S. Surety Co. v. Haid,* 329 Mo. 1220, 49 S.W.2d 41, 42 (1932). In the instant matter, Subcontractor made no showing that Contractor was *unable to satisfy the judgment against it.* Under these circumstances we find no error in the trial court entering judgment against Firemen's in the language it employed. Point denied.

■■■ In its sixth point, Subcontractor maintains the trial court erred in failing to award damages in its favor and against

Firemen's based on the latter's vexatious refusal to pay Subcontractor's claim. Subcontractor asserts the trial court's determination was not supported by substantial evidence, was against the weight of the evidence and erroneously declared and applied the law of vexatious refusal, because Firemen's collaborated with Contractor in deference to its directives to withhold and delay Subcontractor's payments. This point lacks merit.

"Missouri's statutes providing for damages for an insurer's or surety's refusal to pay on a claim or bond respectively, are penal in nature, and are strictly construed." *Missouri Dept. of Transp. ex rel. PR Developers, Inc. v. Safeco Ins. Co.,* 97 S.W.3d 21, 42 (Mo.App.2002); *see* §§ 375.420 and 375.296. "In order to recover penalties for vexatious refusal to pay, the plaintiff must show that the refusal was willful, and without reasonable cause, as the facts would have appeared to a reasonable person before trial." *Id.* "If there is an open question of fact or law, an insurer or surety may insist on a judicial determination of such question without facing the statutory penalties for vexatious refusal." *Id.* "Missouri courts have expressly held that a surety for a solvent principal need not independently investigate a claim on a bond to avoid a penalty for vexatious refusal." *Id.*

Here, the record shows that Firemen's believed Contractor to be a viable, solvent and strong principal, based on its experience of having satisfied a payment bond claim from a supplier with respect to the project in question. Additionally, based on the representations of Contractor, together with its own investigations, Firemen's asserted it had reason to believe there were litigable issues involved in the dispute between Subcontractor and Contractor and, accordingly, it had a reasonable cause to withhold payment. This is born out by the fact that Contractor not only disputed the amount Subcontractor claimed it was owed but also Contractor claimed Subcontractor was indebted to it in an amount exceeding Subcontractor's claim. Firemen's agent testified that it was provided additional information from both Subcontractor and Contractor as the litigation progressed and that its principal, Contractor, continued to claim amounts due from Subcontractor in excess of its claim until two days before trial when information was received indicating that under one of Contractor's alternative theories of recovery against Subcontractor, there might be an undisputed balance of less than $1,000.00.

"The test is not the final determination of the issues, but rather, how the facts appeared at the time of the refusal to pay." *Morris v. J.C. Penney Life Ins. Co.,* 895 S.W.2d 73, 76 (Mo.App.1995). Based on the " 'general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case,' " *Smith ex rel. Stephan v. AF & L Ins. Co.,* 147 S.W.3d 767, 778 (Mo.App. 2004) (quoting *DeWitt v. Am. Family Mut. Ins. Co.,* 667 S.W.2d 700, 710 (Mo. banc 1984)), we cannot say Firemen's refusal to pay the claim was willful and without reasonable cause. Point denied.

In its seventh point, Subcontractor maintains the trial court erred by failing to tax costs against Contractor and Firemen's as mandated by Rule 77.01.[10]

---

10. Rule 77.01 provides that:
 In civil actions, the party prevailing shall recover his costs against the other party, unless otherwise provided in these rules or by law.
 Section 514.090 provides that:

Subcontractor argues the trial court awarded it judgment against both Contractor and Firemen's under Subcontractor's Counts I and V, respectively, of the third amended petition; hence, it was the prevailing party entitled to costs. Therefore, Subcontractor asseverates the trial court erroneously applied the law in refusing to award Subcontractor "judgment for its costs."

■■■ "The trial court has the discretion to award costs if a plaintiff in a multi-count petition prevails on some but not all of its claims." *Hoag v. McBride & Son Inv. Co., Inc.*, 967 S.W.2d 157, 175 (Mo.App.1998); § 514.090. "Accordingly, we will not reverse the judgment of the trial court awarding costs unless it constitutes an abuse of that discretion." *Id.*

Here, Subcontractor's claim contained two counts against Firemen's, at least one of which was determined against Subcontractor. Additionally, in its judgment the trial court granted Contractor "set-off by way of judgment on its Counterclaim in the amount of $33,496.00." Lastly, the trial court determined "both parties," i.e., Subcontractor and Contractor, were at fault and specifically determined that "[a]ll Court costs are taxed to the party incurring the cost." Under these circumstances, we cannot attribute an abuse of discretion to the trial court in failing to tax costs solely against either Contractor or Firemen's. *Hoag*, 967 S.W.2d at 176. Point denied.

In Point Eight, Subcontractor asserts the trial court erred in allowing, considering, and not striking, over its objections,

evidence and testimony of Contractor's project manager, Knight; project architect, Jim Latimer ("Latimer"); Contractor's Estimator, Steve Houser ("Houser"); and Contractor's Senior Financial Analyst, Maurice Harley ("Harley"), who purportedly gave "expert" testimony relating to Subcontractor's "manpower, staffing and scheduling." Subcontractor contends it was acknowledged that these persons were not experts in masonry work, manpower, staffing or scheduling and such persons were never disclosed as expert witnesses as required by the Missouri Court Rules.

■■■ "'The admissibility of evidence, including the testimony of an expert, is a matter within the discretion of the trial court.'"[11] *Whitted v. Healthline Mgmt., Inc.*, 90 S.W.3d 470, 473–74 (Mo.App.2002) (quoting *Cooper v. Ketcherside*, 907 S.W.2d 259, 260 (Mo.App.1995)). "We are, therefore, limited to evaluating on review whether the trial court abused its discretion...." *Id.* "When reasonable persons could differ as to the propriety of the trial court's ruling, however, it cannot be said that the trial court abused its discretion." *Id.* If the trial court's admission of evidence can be sustained on any ground, this Court will affirm. *Smith v. Hofer, Inc.*, 701 S.W.2d 451, 454 (Mo.App.1985).

■■■ To be admissible evidence must be relevant, both logically and legally. *Shelton v. City of Springfield*, 130 S.W.3d 30, 37 (Mo.App.2004). Evidence is logically relevant if it "tends to prove or disprove a fact in issue or corroborate other evidence." *Guess v. Escobar*, 26

---

Where there are several counts in any petition, and any one of them be adjudged insufficient, or a verdict, or any issue joined thereon, shall be found for the defendant, costs shall be awarded at the discretion of the court.

11. " 'The essential test of expert opinion evidence is whether it will be helpful to the fact finder.' " *Safeco*, 97 S.W.3d at 38 (quoting *Fierstein v. DePaul Health Ctr.*, 24 S.W.3d 220, 226 (Mo.App.2000)). "A person with substantive practical and specialized experience in an area can qualify as an expert." *Id.*

S.W.3d 235, 242 (Mo.App.2000). Evidence is legally relevant when its probative value, or usefulness, outweighs its prejudicial effect, such as unfair prejudice, confusion of the issues, undue delay or waste of time, and in the case of jury trial, misleading the jury. *Id.*

We first observe that Knight, repeatedly testified without objection that Subcontractor did not appear to be making sufficient progress toward the completion of its work. " 'Relevant evidence received without objection may properly be considered....' " *Appelhans v. Goldman,* 349 S.W.2d 204, 207 (Mo.1961) (quoting *Goodman v. Allen Cab Co.,* 360 Mo. 1094, 232 S.W.2d 535, 539 (1950)). As previously related, at one point in his testimony Knight testified regarding a letter he wrote to Taylor, Subcontractor's employee, "talking about manpower." Knight related that in writing the letter "[i]t didn't seem like at the time that they had still not made a concerted effort to man the job properly and catch up from the schedule that they were falling behind." Additionally, the letter discussed damages that could be assessed if Subcontractor did not remedy the problem. It is our view that Knight's testimony did not constitute expert testimony, but rather was evidentiary in nature and was properly admitted.

Likewise, Latimer testified he had personal knowledge of Subcontractor's activities at the project site. He related that as architect in connection with the project it was a "masonry intensive" building and further acknowledged that "masonry takes up a larger proportion of the ultimate work on ... a project like this than it will on other types of structures." As Contractor points out in his brief, when Latimer testified that "[w]e didn't feel that the project was adequately staffed," the testimony related to conversations that occurred between Latimer, Contractor, and

the assistant school superintendent, Dr. Lankford. In either event, when Contractor's counsel objected on the basis that the answer given to Latimer was not responsive to the question, and that there was a "lack of foundation," no motion to strike was made. A general objection to "lack of foundation" will not preserve alleged errors because it fails to direct the trial court's attention to the specific foundational element considered deficient. *Carter v. St. John's Reg'l Med. Ctr.,* 88 S.W.3d 1, 19 (Mo.App.2002). Furthermore, "[w]here evidence that might have been excluded upon timely motion to strike is received without such motion, its probative worth and effect are for the trier of the facts." *Simmons v. Dir. of Revenue,* 3 S.W.3d 897, 900 (Mo.App.1999).

More problematic was the testimony of Howser and Harley, in explanation of how Contractor's Exhibit "S" was created. According to Contractor, Exhibit "S" was a chart designed to compare the number of masons actually on the job with those that would have been necessary to complete the job according to the project schedule. Contractor maintains the testimony of its two employees was admissible to refute Subcontractor's testimony regarding whether the job was adequately staffed and could have been timely completed, even using brick laying rates lower than those testified to by Subcontractor. We determine, however, that the trial court's consideration of this evidence did not prejudice Subcontractor to the extent that a reversal and a new trial is required. We presume in a court-tried case that the trial court can sort out the incompetent and irrelevant evidence and base its decision on the competent and the relevant. *Wilson v. Sullivan,* 922 S.W.2d 835, 838 (Mo.App.1996). Point denied.

In its ninth and final point, Subcontractor essentially alleges trial court error in

sustaining and entering judgment on Firemen's motion for partial summary judgment on Subcontractor's claim for vexatious refusal damages. Subcontractor argues Firemen's failed to comply with the provisions of Rule 74.04, in that it did not include a statement of undisputed facts as required by Rule 74.04(c); was otherwise defective; and, accordingly, Firemen's was not entitled to judgment as a matter of law.

We determine that this issue is moot. The issue with respect to the correctness of the trial court's judgment in favor of Firemen's as relates to Subcontractor's vexatious refusal claim has been fully discussed in Point Six. Point denied.

That portion of the trial court's judgment denying Subcontractor statutory interest on the principal sum of $33,561.50, at the rate of 9% per annum, pursuant to section 408.020, is reversed and the cause is remanded to the trial court for entry of an order consistent with this opinion. In all other respects the judgment of the trial court is affirmed.

PARRISH, P.J., concurs in part and dissents in part in separate opinion.

SHRUM, J., concurs.

JOHN E. PARRISH, Presiding Judge, concurring in part and dissenting in part.

I concur in all parts of the principal opinion other than in the disposition of Point Five. As stated in *City of Independence for Use of Briggs v. Kerr Const. Paving Co., Inc.*, 957 S.W.2d 315, 319 (Mo. App. 1997), and referred to in the principal opinion, "[A]s a general rule, a surety's liability for contract damages is coextensive with that of the principal." In my opinion, that rule of law requires the judgment that was entered against the contractor in this case to also be entered against the surety. I suggest that the provision providing that the obligation of the surety would be "null and void if the contractor promptly makes payment directly or indirectly, for all sums due," simply affords the surety the right to secure a release or releases from any part of the judgment that is satisfied by the contractor. Failure to enter a judgment against the surety invites further litigation in the event the contractor fails to pay the damages that were assessed against it.

I would reverse the part of the judgment that purports to impose liability on the surety "to the extent that [Contractor] is unable to satisfy this judgment," and remand with directions that judgment for damages awarded against the contractor be jointly entered against the surety. In all other respects, I concur in the principal opinion.